### No. 2551.

### Second Circuit.

---

## SAVAGE AND WIFE v. TREMONT LUMBER COMPANY, ET AL.

---

(February 8, 1926.   Opinion and Decree.)
(April 10, 1926.   Rehearing Refused.)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Railroads—Par. 58, 67.**

The fact that people repeatedly cross railroad tracks at a certain place where there is no crossing does not place any duty upon the railroad company to treat the place as a public crossing.

2. **Louisiana Digest—Railroads—Par. 68.**

Children who climb between railroad flat cars in order to effect a crossing at a point where a path crossed the railroad tracks, although they could have crossed easily at the public crossing forty feet away, are trespassers.

3. **Louisiana Digest—Railroads—Par. 60, 71.**

Where a railroad crosses a public road, which is used very little, at a flag station in a forest, there is no obligation upon the railroad company to keep a flagman or a lookout.

4. **Louisiana Digest—Railroads—Par. 69.**

The railroad company owes no more duty to a child, a trespasser upon its property, than it owes to an adult under similar circumstances. It owes the child no duty except a negative one of not wantonly or maliciously injuring him.

5. **Louisiana Digest—Railroads—Par. 76.**

Flat cars which are used as regular equipment by the railroad company are not structures or machinery so attractive to children as to be an invitation to them to trespass.

Appeal from the Eighth Judicial District Court of Louisiana, Parish of Winn. Hon. F. E. Jones, Judge.

Action by Thomas C. Savage and Wife against Tremont Lumber Company for damages for the death of their child.

There was judgment for plaintiff, and defendants appealed.

Judgment reversed.

Julius T. Long and A. Leonard Allen, of Winnfield, attorneys for plaintiffs, appellees.

Theus, Grisham & Davis, of Monroe, attorneys for defendants, appellants.

ODOM, J.   Plaintiff's minor child, less than six years old, was killed by one of defendants' trains at a flag station called "Ringwood" in September, 1924, and this suit followed.

Plaintiffs allege that defendants were

grossly negligent in the handling of the train which killed their child.

Defendants, in answer, denied negligence and resisted liability, setting up that the child was killed through no fault of their agents or employees and that their train, at the time of the accident, was handled in the usual manner.

There was judgment in the lower court in favor of the plaintiffs for five thousand dollars and the defendants have appealed.

STATEMENT OF THE CASE AND OPINION.

The defendant, Tremont & Gulf Railway Company, owns and operates a line of railroad running approximately north and south through the Parish of Winn. On this line of railroad, south of Winnfield, there is a flag station called "Ringwood." Passenger trains stop there only when flagged and freight trains only when they have freight to deposit. There is no regular depot there, but there is an open platform 32 by 16 feet, which has a shed over it, and which is referred to as the "depot."

There are two railroad tracks—the main line and a side or passing track which runs parallel with the main line on the west side and within a few feet of it. The platform which is referred to as the "depot" is on the east side, and very near to the main line. These tracks are crossed at that point by a road for vehicles and pedestrians, which road runs on the north side and within four feet of the platform.

The side or passing track, referred to as near to and running on the west side of and parallel with the main track, branches off from the main line, according to the testimony and according to a plat filed by defendants, at a point about one thousand feet south of the crossing, and runs along north and connects again with the main line about four hundred feet north of the crossing.

At or near this crossing these tracks run through a cut about four feet deep.

The Tremont Lumber Company operates a saw mill somewhere on this line of railroad. It gets logs to supply this mill from the forests in the vicinity of Ringwood, and for the purpose of bringing the logs from the woods to the railroad it has a logging or tram road branching off from the main line track on the east side about one thousand feet south of the crossing and running out into the forests.

The logs, as we understand it, are brought out on the logging train to the main line, and are carried over that line to the mill. When the logging or flat cars are unloaded at the mill they are brought back to Ringwood and placed on the side or passing track, as above described, and are picked up by the logging train and carried over the logging road to the woods to be loaded.

On the occasion of the accident there were eighteen of these empty flat cars on this side track, all south of the crossing, the north end of the north car being within a few feet of the public road.

The plaintiffs live on the west side of the railroad and on the south side of the dirt road or highway. Mr. Savage, the father of the child, runs a store or commissary, which is located about forty yards southwest of the crossing. The public school is located on the east side of the railroad track, and on the morning the child was killed it left its father's commissary in company with another child to go to school.

Instead of these children crossing the railroad tracks at the road crossing, which was open and unobstructed at that time, for some reason they climbed up on one of these empty flat cars, which was standing still. Whether they got on the car next to the crossing or the one next to it, no one knows; but while they were on this car the defendants' train, consisting of an engine and about fifteen cars, backed into the side track from the south in order to couple onto the eighteen empty flat cars standing on the main line south of and toward the south, the railroad track makes a slight curve to the right. Situated something like five hundred feet south of the crossing and on the west side of the track, there is a building called the "Feed House." The engine, at the time of the accident, was between 1300 and 1400 feet from the crossing, and the track being curved, the Feed House was between the engineer and the crossing and he could not see it. The train, of course, struck the south end of crossing. Leaving the crossing and going about eight or ten car lengths from the the string of eighteen empty flat cars, it caused the usual jarring and movement of cars under such circumstances. This jarring and movement of the cars caused the child to fall off between the end flat car and the one next to it. It fell to the track beneath the cars and was caught under the wheels and so badly injured that it died a few hours later.

Mr. Ashcroft, the trainmaster, was then standing on the side track. When this defendants did not have a flagman stationed at the crossing at the time, nor was any one stationed there to guard it.

According to measurements made by plaintiffs' counsel, the child was hurt forty-two feet and nine inches south of the road crossing at the time of the accident. He says he was watching the crossing and saw that it was open, but did not look to see if anyone was on the cars, and therefore did not see the children. In fact, no one saw them when they got on or when they fell off the cars. There were one or two persons, not employees of the defendants, sitting on one of these eighteen flat cars, but they did not see the children.

Plaintiffs ground their case upon the proposition that it was defendants' duty to have a flagman at this crossing, and that its failure to do so was negligence, and that if a flagman had been at the crossing he could and would have seen the children on the cars and could have averted the tragedy.

Counsel for plaintiffs cite and quote from a long list of authorities in support of their contention. We have read them all, but do not consider that any useful purpose would be subserved in reviewing them here. In general, they state and apply the rule adhered to by all courts and as laid down by the text writers that it is gross negligence for a railroad to back its trains over public crossings in cities or towns or much frequented private crossings or through the public streets or other places where people and especially children are in the habit of congregating and playing to the knowledge of those in charge of the trains, without a flagman or a lookout stationed to guard such places, and, if at night, without having a bright light on the forward end of the moving train as a signal of danger, or without some other way of giving warning of the approaching train.

But a recognition of this rule would not avail plaintiffs in this case, for the reason, amongst others, that the defendant did not cause the death of the child by backing its train over a crossing. The child was not killed on a crossing, nor was the train

moving over a crossing at the time. It was killed more than forty feet from the road crossing. There was a string of eighteen flat cars, all coupled together, standing on the sidetrack, the end car standing near to, but not over the road crossing. The child had climbed up on one of these cars and was thrown off by the sudden movement of the car, caused by the coupling of them to a moving train, as already described. When the coupling was made, this string of cars was caused to move north until the end car reached and possibly went into the road. But the child was not hit or killed at the road, but fell off the car and was killed more than forty feet south of it, at or near the place where, presumably, it got on the car.

From plaintiffs' commissary, which is on the west side of the railroad track and southwest of the crossing, there is a pathway leading in the direction of the "depot." This path strikes the four-foot cut in which the tracks are located a few feet south of the main road crossing, the exact distance being in dispute. Whether this path went on or across the tracks in the direction of the "depot" is not clear. Counsel for plaintiffs argue the case as though it did, but plaintiffs' testimony does not make that point clear, and defendants' witnesses say, positively, that it did not, but only went down into the cut.

It would therefore appear that it is defendants' theory that after reaching the cut over the pathway pedestrians turn north along the side of the passing track until they reach the main road crossing and cross there. That is the only inference to be drawn from their testimony, as to how and where pedestrians cross. The photographs offered in evidence, some by plaintiffs and some by defendants, do not show a beaten path across the tracks, but they do show the path from the commissary down into the cut.

But, conceding that this pathway did cross the railroad tracks, it is certain that it crossed only a few feet south of the main road crossing. The testimony does not show that if there was a crossing south of the main road crossing it was used to that extent as to stamp it with the character of a public crossing. It had never been recognized as such by the defendants. In fact, the train officials testified that they did not know that pedestrians crossed there at all, and the plaintiffs offered no testimony that they did. It was not defendant's duty to keep this pathway open nor to guard it, and its failure to do so was not negligence, and especially in view of the fact that just a few feet north of there was a public road crossing recognized by every one and kept open by defendants.

It is plaintiffs' contention that when the children got to the point where they saw this path across the track they found it blocked by the standing flat cars and attempted to cross the track by climbing over the cars, and that they had a right to do that, and therefore their child was not a trespasser nor a licensee.

The child had no right and there was no necessity to try to cross the tracks at that point, for the public road crossing, which was only about forty feet to the north, was at the time open and unobstructed.

If, conceding, as plaintiffs contend, that pedestrians did cross the tracks on the path as described, it cannot be said that they had a right to do so, or that they had been invited by the railroad company to do so. Having crossed there without having been granted the right to do so, they were bare licensees.

The following from Elliott on Railroads, vol. 3, section 1647, page 494, is applicable:

"The fact that people repeatedly cross the tracks at a place where there is no public right of passage, does not necessarily entail upon the company any duty to treat the place as a public crossing, and the fact that there are numerous trespassers and the act is committed often does not itself relieve their presence upon the track of the character of a trespass; but situations may arise from which the company ought reasonably to foresee danger, and in such cases it has been held that the company is not absolved from ordinary care and precautions to prevent injuries. Yet, although the place is used repeatedly and frequently as a crossing with the mere silent acquiescence of the company, or with the knowledge and simply passive permission of the company, it would seem ordinarily at least that the traveler who uses it is at most a bare licensee, who takes his license with all its concomitant risks and perils, and, as a general rule, the company owes him no duty greater than that which is due to a trespasser. In order to impose upon the company the duty to treat a place as a public crossing, those who use the place as a crossing must either have a legal right to so use it, or must use it at the invitation of the company, and 'neither sufferance, nor permission, nor passive acquiescence' is equivalent to an invitation."

Plaintiffs' serious and, as we understand it, their main contention, is, that it was the duty of the defendants to maintain a flagman and a lookout at the main road crossing, and that if such had been done the watchman could and would have seen the child on the car and could have averted the accident.

But this is not that character of crossing as to make it necessary, as a matter of law, for the defendant company to keep a flagman there; and under the circumstances surrounding this case and the movement of defendants' trains, it was not necessary to station a lookout there.

The crossing is not in a village, town or city, nor is it in a populous rural section, but is surrounded by forests. There is located there a turpentine distillery, at which three to six men are employed. There are some sixty or sixty-five men engaged in the plugging of the trees from which the turpentine is extracted, and in collecting it, but they are in the woods in remote sections, it not being shown that they live at or near this crossing. The company keeps several wagons in the woods to collect the turpentine and carry it to a central point, where it is taken into wagons and carried to the distillery at Ringwood.

Residing at or near Ringwood, there are two white families, the plaintiffs and one other. There are also eight or ten negro families who live within sight or within two hundred to three hundred yards of the crossing; four or five of these families living on the east side and the others living on the west side of the track. These people presumably work at the still or in the forests. There is no evidence that any others live nearer than a half to three-quarters of a mile.

So far as the testimony discloses, there are very few school children who cross these tracks. Plaintiff operates a commissary for the company, but outsiders do some trading there. People living on the west side cross the tracks to get to the depot, but there is no evidence as to how many cross there. There is nothing about the depot to attract crowds, as passenger trains stop only on flag and freight trains only when they have freight for that point. There is no evidence that people congregate at the station and no evidence at all to show whether the public road, if such it really is, is used much or little by vehicles. It is a flag station in the forest. No one living there except those mentioned. A railroad company is under no obligation to keep a flagman at such crossings.

Hammers vs. Colorado Southern, etc., Co., 128 La. 648, 55 South. 4.

Dr. Emeric de Nux vs. La. Ry. & Nav. Co., No. 1662, Court of Appeal, 2nd Circuit, May, 1922.

Evansville & T. H. Ry. Co. vs. Clements, 70 N. E. 554.

We think the surrounding conditions and circumstances on this occasion were not such as to make it necessary for the defendant to have a lookout at the road.

But even if it be conceded that it was the duty of the company to have a flagman or a lookout there, on that occasion, his duty was only to watch the crossing and not other portions of the track, under the circumstances shown by the evidence.

The rule is thus stated in 33 Cyc., page 784:

"In the absence of a provision in the statute specifically designating persons to whom the duty of giving crossing signals or warnings is due, it is generally held that such warnings are due only to persons on the highway using, about to use, or who have just used the crossing, and not to trespassers or licensees on the railroad tracks or right of way at places other than a crossing, nor to persons riding or driving along parallel to the railroad."

This is the rule in Louisiana.

In the case of Hammers vs. Colorado Southern, Etc., Co., cited, supra, the court said:

"We do not think that the exercise of due care on the part of a railroad company requires it to look under its stationary cars, before moving them, to ascertain whether somebody is not sitting on one of the rails."

And in Jordan vs. Grand Rapids Co., 70 N. E. 524, the court held:

"A railroad company is not required before moving cars on a side track to examine them to prevent injury to persons trespassing thereon."

With reference to the duty which a railroad company or the owner of other property owes to children, the rule is stated in 33 Cyc., page 769, as follows:

"The above rule also applies to children who are on the track. If the child is thereon as a licensee without invitation, the railroad company owes it no duty except not to wantonly or wilfully injure it, unless its presence is known to the railroad employees, in which case reasonable care should be used to protect it from danger. Likewise where the company has reason to expect that children will be on the track at a certain point, it is under the duty of using ordinary care to discover their presence and avoid injuring them."

This rule is followed by our own Supreme Court.

See:

Fredericks vs. Ill. Cent. R. R. Co., 46 La. Ann. 1180, 15 South. 413.

O'Connor vs. R. R. Co., 44 La. Ann. 344, 10 South. 678.

In the case of Peters vs. Pearce, 146 La. 902, 84 South. 198, the children were attracted to a pile of logs and climbed thereon, and one of them moved the skidpole, which caused the logs to roll down on the other one, and the court said:

"It appears that Blanchard Peters, the 6-year-old brother of the injured boy, was attracted to the pile of logs, climbed thereon, moved the skidpole, and caused the log to roll down upon his brother, Garland, aged 4½ years.

\* \* \* \* \* \* \*

"The child Blanchard may not have been a trespasser, yet the owner of the property was under no duty to him to keep his premises safe; and the fact that the child was an infant cannot have the effect of creating a liability where none would have existed in the case of an adult under similar circumstances. Defendant owed the

child no duty except a negative one of not wantonly or maliciously injuring him."

See, also: Alabama Great Southern Ry. Co. vs. Moon, 22 Sou. 900 (116 Ala. 642).

We do not think the railway company was negligent in coupling its cars as it did, nor do we think it had reason to suppose the child or any one else would attempt to cross its tracks by climbing over a stationary car only a few feet from an open crossing.

We have not overlooked the general rule invoked by counsel for plaintiffs, that the owner of property cannot escape liability for injuries inflicted when he places thereon structures or machinery so attractive to children as to be practically an invitation to them to trespass merely because they had no legal right to be upon the property.

These flat cars were part of defendant's equipment and were used by them constantly. The usual place to leave them was on this side track, and they were familiar objects to all who lived or went there. They did not amount to traps on defendant's premises.

Counsel for plaintiffs, in brief, say that the cases of Ryan vs. L. R. & N. Co., 146 La. 39, 83 South. 371, and Draiss vs. Payne, 158 La. 653, 104 South. 487, are not easily distinguishable from the case at bar. But a reading of those cases will readily disclose that the conditions and circumstances as detailed therein are not at all similar to those in this case.

In the Ryan case, plaintiff's child was injured while attempting to cross the principal street in the city of Baton Rouge. The child, with a companion, was racing up and down the square for an hour; the flagman saw them, but when the train approached he disregarded their presence and took no notice of their movements un-

til it was too late to avoid the accident, stating that he thought they had more sense than to go on the track. The flagman was an epileptic to the knowledge of the defendant. The court held that the flagman was incompetent and that it was negligence for the defendant to place him in such a responsible position; that if the flagman had done his duty the train could have been stopped in time to save the child, and the court said:

"It may not be negligence per se for a train to be operated in the manner just indicated, through the streets of a populous city; but, when the same is done, every possible precaution should be taken to avoid accidents."

In the Draiss case, a train was being backed over a crossing in one of the principal thoroughfares in the city of Shreveport at night while running in violation of a city ordinance requiring a flagman and light to be maintained there. The crossing was a dangerous one and was left unguarded, and the view of approaching trains from the south was obstructed by a hedge fence and the tower at the gates.

We, in common with all others, deplore the tragic and sad death of plaintiffs' child. But courts must rest their decision on the facts and the law and not upon sympathy.

The following quotation is taken from the case of Peters vs. Pearce, 146 La. 902, 84 South. 198, and is pertinent here:

"There is danger in dealing with the question of liability for injury to children with confounding legal obligations with those of sentiments which are independent of the law, and rest merely on grounds of feeling, or moral consideration. While more indignation is felt towards an injury done to children than to injuries done to others, the law has not usually given them civil remedies on any such basis. Neither does it usually, if ever, impose any duty on

strangers toward them, resting entirely on the fact that they are children. Strangers are not liable to children for negligence in carrying on their business beyond what would be their liability to others, as well as children, who are equally free from blame. Hargraves vs. Deacon, 25 Mich. 1."

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be avoided and reversed and plaintiffs' suit dismissed at their cost.