## No. 3059

### Second Circuit

(Second Division)

---

## JOHNSON v. TEXAS & PAC. RY. CO.

---

(April 9, 1931. Opinion and Decree.)
(June 11, 1931. Rehearing Refused.)
(June 24, 1931. Writs of Certiorari and Review Refused by Supreme Court.)

---

Henry W. Bethard, Jr., of Coushatta, attorney for plaintiff, appellant.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for defendant, appellee.

TALIAFERRO, J. This suit is brought, by Susie Johnson, surviving widow of. Charley Johnson, deceased, and as natural tutrix of their seven minor children, to recover damages against the defendant for $25,000, for the death of the husband and father, on December 18, 1925.

It is alleged that deceased was wantonly and negligently killed by a through freight train of defendant, operated by its agents and employees, at a dangerous and unlawful rate of speed, a short distance west of Williams station in Red River parish; that deceased was of unsound mind, addicted to temporary partial insanity, and when thus afflicted was oblivious to his surroundings and totally or partially deaf, dependent upon the degree of insanity; that when killed he was partially demented over some business matter of his own; that deceased was traveling in the same direction as the train, and that the defendant's track, at and about the point where deceased was killed, is straight for some two miles and the view unobstructed; that the train crew saw deceased when a mile or more from him and observed his condition, but, notwithstanding this, they continued to operate the train at a high, unlawful and negligent rate of speed until deceased was run down and killed; that there was ample opportunity to have stopped the train, after discovering the perilous condition of deceased, but no effort was made to do so.

It is further alleged that defendant's tracks in the vicinity of Williams station, to the knowledge and with the acquiescence of defendant's officers, agents, and employees, are constantly used by pedestrians in going from place to place; that the community there is thickly populated; that said Charley Johnson was not at fault; but his death was solely due to the

fault of defendant company, its officers, agents, and employees.

The answer of defendant is a general denial of plaintiff's allegations, excepting those relating to the mental lapses to which deceased was subject and impairment of hearing when so afflicted, which are admitted. For further defense, defendant avers that the accident resulting in the death of Charley Johnson was occasioned solely by his own fault and negligence in being and walking on defendant's tracks without exercising the required precaution to learn of the probable approach of trains, and remaining thereon in the face of an approaching train and not heeding alarms and warnings given for him to remove; that his contributory negligence in thus conducting himself bars recovery.

Defendant filed a supplemental answer wherein it is averred:

"That while said decedent was of unsound mind and addicted to temporary flights or partial insanity, at which times he was oblivious of surrounding objects and was also at such times deaf, and that on the day he was killed he was so partially demented, these facts were not known to defendant's employees and agents in charge of its train."

The case was tried in the district court without a jury and plaintiffs' demands were rejected. They have appealed.

We do not find any serious differences between the evidence of both sides. With little or no exception, it is all reconcilable.

The train that killed decedent was a through freight, making the run from Marshall, Tex., to Boyce, La. It consisted of 70 cars, 55 loaded and 15 empty, plus locomotive, tender, etc., carried a load of 2,973 tons, and was moving at the rate of from 25 to 28 miles per hour. These cars averaged 40 feet long, thus making the entire train over 2,800 feet in length.

Charley Johnson was on defendant's track traveling easterly, and the train was moving in the same direction. He was about midway between Williams station and Cupples crossing when struck down. The distance between the station and crossing is about one-half mile.

When the train rounded the curve, about two miles west of the station, its whistle was blown. Several witnesses farther distant than decedent testified to having heard it. A short distance before reaching the crossing, the whistle was again sounded—two long and two short blasts—followed, in a very short interval of time, by a succession of shrill blasts, in an effort to attract decedent's attention to the train moving down upon him.

The engineer of the train testified that, when about 150 yards of deceased, he realized that the warnings were not having any effect on him; that he was making no effort to get off of the track, and it was then that he shut off the engine throttle and began making preparations to stop. This evidence is corroborated by that of other members of the crew. The engineer stated that he first discovered deceased on the track when about three-fourths of a mile from him. All of the witnesses who were observing deceased immediately prior to and at the time of the accident agree that he was walking slowly down the track apparently absorbed in the study or reading of a paper he held in his hands and at no time made any move or did any act that indicated he was conscious of the train's approach.

The train was making about 20 miles per

hour when deceased was struck, and 28 cars passed over his body before a stop could be made. Assuming that the engineer began to check the train when 450 feet from point of accident, it required over 1,600 feet to bring the train to a stop. The brakes of the train were in good condition. It usually requires 2,400 feet to stop a train of this kind, according to the evidence.

Counsel for plaintiffs, after recounting the facts of the case, submits that the principal question of fact before the court is: Could the engineer have avoided the accident?

There is no doubt that the engineer could have brought his train to a dead stop within the three-fourths of a mile that intervened between him and the deceased, had he begun taking steps to do so immediately after recognizing deceased on the track. He could, also, have brought the train under such control within said distance as to have stopped it within 450 feet. The question arises: Under the circumstances, was the engineer required to do either of these acts?

Counsel for plaintiffs, after stating that this case turns upon the doctrine of the "last clear chance," says: "We admit that it seems to be the settled doctrine of the State of Louisiana that persons in full possession of their faculties who walk along a track in front of an approaching train and do not avoid the accident by stepping off the track, that such negligence bars recovery"—citing Harrison v. La. W. Ry. Co., 132 La. 761, 61 So. 782; Wells v. M. L. & T. Ry. Co., 147 La. 58, 84 So. 493.

In the Harrison case, the court, after finding that the railway train had been run through the city of Lake Charles, where persons habitually walked on its tracks, at a rate of speed twice that permitted by ordinance, and without any lookout by the engineer, was culpably negligent, yet denied recovery for death of a pedestrian where the evidence showed that deceased was guilty of contributory negligence in failing to keep any lookout for train, which he knew was due, and could have avoided the accident at any time by stepping of the track.

In the Wells case, the facts were that deceased flagged an approaching train in order that his friend might get aboard, and, assuming that the train would respond to the hail and stop before it reached him, proceeded to walk down the track and was killed. His contributory negligence barred recovery.

The syllabus of this case, in part, is:

"The engineer of a train has the right to assume that a man who knows of its approach will not remain on the track and be run over."

In the course of examination of the engineer in charge of the train that killed Charley Johnson, the following questions were asked and answered by him:

"Q. When you sounded that alarm, what did you expect him to do?
"A. I expected him to take some notice of my train approaching and get off the rails.
"Q. Did you know this negro?
"A. No, sir, I did not.
"Q. Did you know that at the time he was insane?
"A. No, sir, I did not.
"Q. Did you know he was deaf?
"A. I did not.
"Q. You assumed him to be a normal man in possession of his faculties?
"A. I did.
"Q. As you continued to approach him, did you give him warning again?
"A. I did.

"Q. About how far were you from him when you gave this series of short blasts?

"A. I'll say about 150 yards from where he was struck.

"Q. Then you realized—when you saw that he did not pay attention to that one, what did you do?

"A. I shut my engine throttle off, and began making preparations to stop.

\* \* \* \* \* \* \*

"Q. Then when you really did begin to try to stop, it was too late to do any good?

"A. Impossible to stop after I realized he was not going to get off.

\* \* \* \* \* \* \*

"Q. Don't people usually on the track, when you sound a whistle, turn around or give some indication of having heard it?

"A. Some of them do and some of them don't.

"Q. Don't you become suspicious and alarmed that something might happen if they do not give any indication of not having heard your alarm?

"A. I do not, because I see them daily along the track, in front, never look back or to the side, until just before the engine gets to them, step off and smile.

"Q. Then you depended solely on the man stepping to avoid the accident?

"A. I expected him to have enough human intelligence to step off the rails."

Plaintiffs also cite the following cases in support of their contention that defendant is liable: Jacoby v. Gallaher, 10 La. App. 42, 120 So. 888; Betz v. I. C. R., 161 La. 932, 109 So. 766; Belle Alliance Co. v. T. & P. Ry. Co., 125 La. 777, 51 So. 846, 19 Ann. Cas. 1143; Gibson v. T. & P. Ry. Co., 10 La. App 678, 121 So. 382; Jones v. C. R. I. & P. Ry., 4 La. App. 457; Id., Jones v. Chicago, R. I. & P. Ry. Co., 162 La. 690, 111 So. 62. None of these cases are in point. The facts are not on all fours with those of the instant case.

The decisions draw a line when considering the last clear chance doctrine, between cases where injury has occurred to children or drunken people by railway trains, and those where the injured person is grown and to all appearances in normal condition, mentally and physically.

It has frequently been held that, if the engineer sees children playing on the track ahead, or near thereto, or sees a person lying on the track or against the ties, or in any other position indicating him to be abnormal or intoxicated, a greater degree of care and caution is required, and if such a situation becomes known to the engineer in time for him to stop his train or slow down in time to avert the accident, and he does not do so, the doctrine of the last clear chance applies, and the railway company will be held liable, though there be contributory negligence on the part of the injured person. Gibson v. T. & P. R. Co., 10 La. App. 678; Jacoby v. Gallaher, 10 La. App. 42. And many cases cited in these decisions.

However, that rule does not apply when the engineer looks down the track and sees a grown person walking leisurely along. He has the right to assume that such person will exercise ordinary care and prudence to protect himself from injury.

We do not think a decision of this case turns upon application of the last clear chance doctrine.

Here, we have a train over 2,800 feet long, carrying a heavy load, moving at a not excessive rate of speed in an open country, which could not be stopped, after applying all the means available, under 1,600 feet or more. It would be unreasonable to require, and the law does not require, the crew to slow down the train nor bring it to a stop every time an adult person is seen ahead walking on the tracks apparently in possession of his senses.

In Schexnaydre v. T. & P. Ry. Co., 46

La. Ann. 248, 14 So. 513, 49 Am. St. Rep. 321, the court held:

"Where a party goes on a railway track for the purpose of using it as a highway, he, to a certain extent, assumes all risks, and it would require very gross negligence, amounting to malice, to make the railroad company liable to him; and this rule applies with greater reason when the injured party has a safer mode of travel by a public highway.

"Greater care, caution, and prudence are required of a deaf-mute who goes on the railroad track than from one in the full possession of all his senses. If he uses the roadbed as a highway, placing himself in a situation where hearing is one of the essentials of safety, it is negligence on his part." Nelson v. T. & P. Ry. Co., 140 La. 676, 73 So. 769.

The evidence discloses that Charley Johnson, the deceased, suffered from mental lapses, and that this condition was accompanied by partial deafness, but these infirmities were unknown to defendant's train crew. The evidence further shows that a gravel highway nearby parallels the railroad where deceased was killed.

In Hebert v. L. W. Railroad, 104 La. 483, 29 So. 239, it is held:

"The engineer of a train running on schedule time, on its own right of way, in the open prairie, away from any town or crossing, is not called upon to immediately slacken its speed from the simple fact that a trespasser sitting upon the ties does not at once rise and change his position on receiving warning of the approach of the train by the ringing of the bell and the blowing of the whistle, duly and properly given.

"The engineer has the right to assume that he will ultimately obey the signals, and is not held to presume, in the absence of some special circumstance, that the inaction of the trespasser is due to some physical cause or infirmity which prevents his leaving the ties." Cook v. Ry., 130 La. 917, 58 So. 767; Nolan v. I. C. Ry., 145 La. 483, 82 So. 590; Saitta v. Y. & M. V. Ry., 153 La. 1099, 97 So. 261.

Corpus Juris, volume 52, page 604, under the title, "Right to Presume that Person Will Leave Track or Avoid Danger," says:

"It is a well settled rule that, where the railroad employees in charge of a train see a person on or near the tracks in advance of the train, unless they know or can see from his condition, or his conduct, or from the surrounding circumstances that he will not or cannot retire to a place of safety in time to prevent an accident, they have a right to presume that such person is of sound mind and good hearing and eyesight, and that such person will make a reasonable and proper use of his senses; and where the proper alarm signal or warning, as by bell or whistle, is given to him of the approaching train, they have a right to act on the assumption that he will hear and heed the warning when given, and will retire to, or remain in, a place of safety in time to prevent injury from the approaching train of which he has knowledge or of which, by the ordinary use of his senses, he should have knowledge." The author cites the three cases mentioned above.

There is another legal principle which makes the doctrine of the last clear chance inapplicable in this case, even if it be conceded that defendant was negligent. Decedent, afflicted by infirmities, as he is shown to have been, should have exercised greater care and caution when on defendant's tracks than a person in full possession of his faculties and senses. He did not exercise the prudence the law required of him by keeping a lookout for approaching trains. His conduct on this score rendered him guilty of negligence, and this continued down to the moment of the accident. If the negligence of deceased is concurrent with that of defendant to the moment of the tragedy, no recovery will lie. Harrison v. Ry. Co., supra; Gibbs v. I. C. Ry. Co., 11 La. App. 697, 123 So. 186;

Castile v. O'Keefe, 138 La. 479, 70 So. 481; Hudson v. N. O. Ry. & Light Co., 147 La. 56, 84 So. 492.

This doctrine was applied in the very recent case of Jarrow v. City of New Orleans, 168 La. 992, 123 So. 651. In this case, the court reaffirmed its holdings in the Harrison and Castile cases. Also applied in Thompson v. Morgan, 167 La. 335, 119 So. 69.

Plaintiffs take the position that, as pedestrians habitually used defendant's track about Williams station to travel on without objection from defendant, the deceased, when killed, was a licensee, while, on the other hand, defendant contends that he was a trespasser.

The evidence shows that the railway runs through a plantation country where decedent was killed, not thickly populated; that footmen freely use the track to travel on during the winter or bad weather, though there is nothing to show that they were invited or authorized to do so. At the point where the accident happened, the right of way is fenced.

Under this state of facts, the Supreme Court has frequently held that the person so using a railway company's tracks is a trespasser.

In Castile v. O'Keefe, 138 La. 479, 70 So. 481, the court said:

"A trespasser on a railroad track, who fails to make use of his eyes, to keep himself informed of the approach of trains, will, in case of injury, be held guilty of such contributory negligence as to bar recovery, notwithstanding the concurrent failure of the servants of the railway company to keep a proper lookout." To the same effect is Sanders v. T. & P. Ry. Co., 118 La. 174, 42 So. 764.

In the Castile case, supra, page 482 of 138 La., 70 So. 481, 482, the court remarks:

"While the evidence shows that pedestrians used the railroad embankment and tracks as a passageway, there is nothing to suggest that such use was licensed by the railroad company. As a matter of common observation, it is practically impossible for a railroad company to prevent tramps and other trespassers from walking on its tracks."

If deceased was a trespasser, defendant owed him no duty, except a negative one of not wantonly and maliciously doing him injury. Savage v. Tremont Lumber Co., 3 La. App. 704.

In our opinion the judgment appealed from is correct, and it is hereby affirmed.

## ON APPLICATION FOR REHEARING

PER CURIAM. Counsel of plaintiffs in application for rehearing in this case has incorporated therein citation of authorities in support of his position, together with earnest and forceful argument of his own.

It is alleged that we erred in our opinion herein in holding, or apparently holding, that an insane person may be contributorily negligent to such extent as to bar recovery of damages for injuries sustained by him.

There are varied kinds and degrees of insanity. Because one is of unsound mind or of weak mind, he may be referred to as insane, yet he may have an acute sense or power of discrimination, especially in the presence of danger. No one will contend, nor did we hold, that a maniac, or one totally bereft of all ability to appreciate right from wrong, danger from safety, could legally contribute to negligence.

The deceased, Charley Johnson, the evidence clearly shows, was not, on the day

he was killed, nor had he ever been, in such mental condition, nor had he ever experienced such mental lapses, as would render him totally void of the power to discern danger or dangerous conditions, patent to all, who could guard against them.

A rather unique situation is disclosed from the record in this case which was not touched on in our original opinion. For the light it will throw on the case, our original opinion, and our action in denying the application for rehearing, we now briefly go into the matter.

The petition substantially sets forth that deceased "was of unsound mind, addicted to temporary partial insanity and when thus afflicted, was oblivious to his surroundings and totally or partially deaf, dependent upon the degree of insanity; that when killed he was partially demented, etc., * * *." Defendant by its supplemental answer admits these allegations of fact, but disclaims knowledge of such on part of its train crew. Ordinarily these averments; together with the admission of defendant, would close the question. However, plaintiff's own testimony contradicts the allegations of the petition on this point, which shows that deceased was not totally insane nor partly deaf. We quote her testimony, given on direct examination, so far as pertinent to this issue:

"Q. Was Charley (referring to deceased) hard of hearing? He could hear all right? Was he weak-minded?
"A. Yes.
"Q. Would he have spells?
"A. He didn't have any spells, not that I know of.
"Q. You say he was weak-minded?
"A. Well, he was kinder weak-minded.
"Q. Could he hear as good as we can?
"A. Yes, sir.

"Q. When he was weak-minded could he hear as well then as at other times?
"A. Yes, sir; he never had any spells.
"Q. What would he do when he was weak-minded?
"A. Nothing.
"Q. How did you know that he was weak-minded?
"A. He didn't have as much sense as he ought to have, but he was all right. He was a good worker.

\* \* \* \* \* \* \*

"Q. How many bales of cotton did he raise the year before he died?
"A. Nine or ten bales, sometimes."

It appears that deceased owed his landlord quite a large account, for one of his condition, and it worried him. There is evidence in the record to the effect that when killed, he was returning from a trip to see a Mr. Bonner to whom he had gone for assistance in his business affairs, as appears from the following testimony of plaintiff:

"Q. Did you know he was going to Mr. Bonner?
"A. Yes, sir.
"Q. Did he tell you what he was going up there for?
"A. He told me he was going to see about arranging his business.
"Q. He was planning on moving with Mr. Bonner, wasn't he?
"A. He must have."

Deceased was no doubt not of strong mentality and when worried revealed a shortcoming in this respect not uncommon to members of his race. His widow positively states that when these conditions prevailed his hearing was good, seemingly unimpaired. He had been on a business mission of first importance to him, that of arranging his old account and preparing for the coming year's operations. Some intelligence was required to do this.

Rehearing refused.