### PERRY et al. v. LOUISIANA & A. RY. CO.*
### No. 4299.

Court of Appeal of Louisiana. Second Circuit.
June 29, 1932.

White, Holloman & White, of Alexandria, and Burford & White, of Shreveport, for appellant.

J. O. Gunter, of Natchitoches, and George T. McSween, of Shreveport, for appellees.

McGREGOR, J.

This is a suit for damages brought by the plaintiff for herself and her two minor children against the defendant on account of the death of her husband, the father of her two minor children. On April 15, 1930, S. L. Perry, the deceased, lost his life by being struck by defendant's locomotive engine pulling a mixed train, going south at an intersection of the railroad with the public highway at Grappes Bluff in Natchitoches parish, a flag station on the said road.

In her petition the plaintiff alleges that the death of the decedent was caused by the defendant's train, operated by its agents and employees in a negligent, wanton, and careless manner. Particulars of negligence are set out as follows:

(a) In not slowing up for the crossing, and not having the train under control where it could be stopped in a reasonably short distance.

(b) In not giving any warning to the deceased by bell, whistle or otherwise.

(c) In not stopping the train when the de-

ceased was in a position of danger and was unaware of the approaching train.

In its answer the defendant denies any and all negligence on the part of its agents and employees, and avers that the deceased's death was the result of his own negligence, in that he walked upon the railroad track of defendant, at the Grappes Bluff crossing, in the face of an approaching train, which was almost upon him. It is specially alleged that alarms were duly given, that the train crew attempted to stop the train as soon as deceased's peril appeared imminent, but that it was impossible to stop before striking him, and that he failed to heed the warning. In the alternative, contributory negligence was pleaded.

At the trial in the district court there was judgment for $5,000 in favor of the plaintiff individually, and for $4,000 for the benefit of her minor children. From that judgment the defendant has appealed.

### Opinion.

The facts in this case are simple and undisputed. Several witnesses saw the deceased immediately after he was struck and while his body was in the air and as it fell to the ground. But only three witnesses, the engineer and the fireman of defendant's locomotive pulling the train, and a negro truck driver, saw him before and as he came upon the track in front of the train. It is upon the testimony of these three witnesses alone that the decision in the case must turn.

■ It must be conceded that Perry was negligent in walking upon the defendant's track as he did. If he was unaware of the presence of the train, that fact does not excuse him in the least, for the law places upon every one the obligation to stop, look, and listen both ways before going upon a railroad track. It not only requires that this be done, but it requires that it be done effectively. In other words, the law does not permit one to go upon a railroad track, either to cross it or to walk upon it, unless and until, through the exercise of the senses, one has ascertained that it can be done with safety.

In spite of the evident negligence of the deceased, the plaintiff contends that the defendant, through its agents and employees, was also guilty of negligence, and that it had the last clear chance to avoid the accident.

At Grappes Bluff defendant's railroad runs north and south. Just east of the main line, on the right of way, there is a side or switch track, and just east of this track there is the public highway. There is a road that crosses the two railroad tracks from east to west. On the occasion of the fatal occurrence with which this case deals, S. L. Perry, husband of plaintiff and father of her children, undertook to cross the defendant's side track and its main line by way of this crossroad. No one except A. R. Stacks and Charlie Luciene, a negro, defendant's engineer and fireman, and Lonnie Mills, a negro truck driver, saw the deceased before and as he went upon the track. All the other eyewitnesses had their attention attracted by the sudden blast of the locomotive whistle, and saw him as he was struck and while he was in the air falling to the side of the railroad.

Defendant's mixed train was approaching the crossing from the north. When about 1,200 feet north of the crossing or station, the engineer blew for the station to inquire whether there were any passengers on board to get off at that point. He received the "highball" signal, indicating that there were no passengers, and then he blew the regulation whistle for the crossing.

S. L. Perry, the decedent, was east of the railroad on the public highway at about where the crossroad that crosses the main line of the railroad and the switch track intersects or runs into the highway. He evidently desired and intended to cross over the railroad to the west side for some purpose.

Lonnie Mills, a truck driver, talked to him for several minutes just before the accident on the public highway at a point about 10 feet from where the crossroad intersects the highway. The truck was parked on the right side of the highway facing north, so that Mills could see the defendant's train coming down the track. When the deceased left the truck and started west to cross the railroad, Mills saw him all the way. His testimony on this point is as follows:

"Q. How old are you? A. I will be twenty-five this year.

"Q. You are a colored boy, aren't you? A. Yes, sir.

"Q. Where do you live? A. My home is in Longview, Texas.

"Q. What are you doing? A. Working in a hotel.

"Q. Did you see Mr. Perry when he was killed in April of last year? A. Yes, sir.

"Q. What were you doing? A. Well, I was hired to drive a truck.

"Q. Where was this truck parked? A. On the right side of the highway.

"Q. How far from the crossing? A. It wasn't over ten feet.

"Q. State whether or not Mr. Perry talked to you shortly before he was killed? A. Yes, he told me white people didn't allow negroes to drive trucks over there.

"Q. Did he keep on talking to you? A. Yes, he talked to me about twenty or twenty-five minutes.

"Q. Well, he quit cursing you, or did he quit? A. He cursed me as long as he stood up there.

"Q. Did you see the train coming? A. Yes, sir, after it whistled.

"Q. How far away was it when you saw it? A. I don't know, something like four or five telegraph posts down the track when I first saw it.

"Q. State whether or not Mr. Perry stopped, looked and listened before he got on this track? A. He never looked up, but one time and that was when he left the truck, he never turned his head any more.

"Q. State whether or not the train sounded sharp blasts before it struck Mr. Perry? A. Yes sir, it did.

"Q. State whether or not the train stopped quickly. A. Well, it stopped in about one hundred and fifty feet.

"Q. Do you know whether or not the bell was ringing? A. It was ringing.

"Q. State whether or not you had any trouble making him hear you, while you were talking to him. A. No, sir, I didn't have a bit of trouble.

"Q. What impression did you have as he walked down the track, as to whether he was going to stop or not? A. I thought he was going to stop, if I hadn't I could have caught him."

A. R. Stacks, the engineer, testified that he first saw the deceased coming toward the track from the east or on the fireman's side of the engine when the engine was about 360 feet from the crossing and when the decedent was on the crossing road about 20 feet east of the main line on which the train was running. Naturally, as the train was running much faster than deceased was walking, the deceased soon passed out of the line of vision of the engineer. There was nothing in the movements of the deceased up to this point to suggest danger or peril, as the engineer and fireman had a right to presume that he would stop before reaching the track.

When the train was within 100 feet of the crossing, the fireman, who had been watching Perry approach the track from the east, saw that he apparently was going upon the track regardless of the near approach of the train, and "hollered" to the engineer "that there was a man coming on the track." The engineer immediately set his air brakes and blew the whistle in an emergency alarm. All during the time that the train was approaching the crossing, even before either the engineer or the fireman had seen Perry, the engine bell was ringing according to regulations. In spite of the rumbling noise of the approaching mixed freight and passenger train and the ringing of the bell, Perry seems not to have been conscious of danger, and walked upon the track and stood with his back to the train until he was struck. At the time that it became evident that Perry was going upon the track, the engineer was within 100 feet of him, and it was impossible to stop the train before reaching the point where he was. But the whistle was sounded in time for him to get off the track, and, since he did not do so, his death was inevitable. The pertinent part of the engineer's testimony is as follows:

"Q. Were you the engineer on the train, on the 15th of April, 1930, at the time Mr. Perry was killed? A. Yes, sir.

"Q. Do you know about how many cars you had in that train? A. Somewhere about fifteen.

"Q. What kind of a train was it? A. It was a mixed train.

"Q. What do you mean by that? A. Handling freight and passengers.

"Q. You had a freight and a passenger? A. Yes, sir.

"Q. And between your engine and these coaches were the freight cars? A. Yes, sir.

"Q. What sort of station is Grappe's Bluff? A. It is a flag station.

"Q. In your stopping there, is there anything to mark the flag stop? A. Nothing to mark it, there is a level place where the passengers get off and on.

"Q. Is there a road crossing there? A. Yes, sir.

"Q. As you approached that stop that afternoon, what did you do? A. I blowed for the station.

"Q. Why did you blow for the station? A. To see if we had any passengers to get off or any to get on.

"Q. About how far away from the station were you when you blew? A. About twelve or fourteen hundred feet.

"Q. What answer did you get? A. I received a high-ball from the rear end.

"Q. What does that mean? A. That is a signal that we have no passengers to get off.

"Q. What did you do then? A. I blew the road crossing whistle.

"Q. Was the bell ringing or not? A. It was ringing.

"Q. What happened when you got close to the station? A. When we got within one hundred feet, the fireman hollered that there was a man coming on the track and I applied the air and emergency and blowed the whistle.

"Q. This man was Mr. Perry? A. Yes, sir.

"Q. What opportunity did you have to avoid striking him? A. None whatever.

"Q. Did you see him before he got on the crossing? A. I saw him when we were about Three hundred and sixty feet from there.

"Q. Where was he? A. About twenty feet from the main line.

"Q. Was he on this dirt road that crosses the main track? A. Yes, sir.

"Q. Which way was he going? A. Coming toward the track.

"Q. And he was about twenty feet away? A. Yes, sir.

"Q. Did he give any indication of getting on the track at that time? A. No, sir.

"Q. You could see him all right? A. Yes, sir.

"Q. What was there to keep him from seeing your train? A. Nothing.

"Q. State what obstructed your view of him further. A. After we went just a few feet, I guess, well probably one hundred feet or more he went out of my view.

"Q. You were one hundred feet away from the crossing you mean? A. Yes, from where I first seen him.

"Q. What made him go out of your view? A. The engine came between us.

"Q. What was the next thing you heard? A. The fireman hollered.

"Q. What did you do? A. I applied the air and emergency.

"Q. Did you, or did you not make an emergency stop? A. I did.

"Q. About how many cars went over the crossing? A. The engine and about three cars.

"Q. Did you see the engine strike Mr. Perry? A. Yes, sir.

"Q. What was he doing at the time? A. He was walking.

"Q. What could you have done to prevent the accident? A. Nothing.

"Q. I say what did you do to prevent it? A. I applied the air and emergency.

"Q. What else could you have done? A. Nothing.

"Q. State what else you could have done to avoid this accident. A. Nothing."

That portion of the fireman's testimony that relates to the accident is as follows:

"Q. Were you fireman on that train on which Mr. Stacks was engineer when Mr. Perry was killed? A. Yes, sir.

"Q. What time of the day was that? A. About 3:05 o'clock in the afternoon.

"Q. What sort of day was it? A. It was a clear day.

"Q. It wasn't raining was it? A. No, sir.

"Q. What sort of station is Grappe's Bluff? A. It is just a flag station.

"Q. Is there any houses around there? A. Very few.

"Q. No station house? A. No, sir.

"Q. What sort of place is it where the passengers get off and on? There is no platform? A. No, sir.

"Q. Is there a road crossing? A. Yes, sir.

"Q. What kind of train were you running? A. A mixed train.

"Q. A passenger and baggage coach? A. Yes, sir.

"Q. What signal did the engineer give? A. He blowed first for the station.

"Q. What is that for? A. That is to see if there is anybody to get off or on.

"Q. What sort of answer did he get? A. They gave him a high-ball to go ahead.

"Q. Where did it come from? A. From the rear end.

"Q. Who gave it? A. The brakeman or the conductor.

"Q. What does that mean? A. Nobody to get off.

"Q. What did Mr. Stacks do then? A. He blowed for the crossing.

"Q. What did you do? A. I rang the bell.

"Q. Where were you seated? A. On the left side.

"Q. After you got this high-ball, state whether or not you looked down the track, in the direction you were going? A. Yes, sir.

"Q. State whether or not anybody was flagging the train. A. No, sir.

"Q. Where was Mr. Perry when you first saw him? A. He was coming from toward the highway, coming toward the main line.

"Q. Did you see him when he came out of the highway on to the track? A. Well, when I first recognized him, he was inside on the right-of-way.

"Q. Inside the telegraph poles? A. Yes, sir.

"Q. What did he do, just walk on the crossing? A. Yes, sir.

"Q. On the dirt road? * * *

"Q. What do you mean by the crossing? A. The cars go across the main line.

"Q. State whether or not he was on your side, or the engineer's side? A. He was on my side.

"Q. As he came up close to the main line what did you do? A. Well, I was ringing the bell and when he got across the side track I hollered to the engineer to stop there was a man coming across.

"Q. What did he do? A. He put on the air and emergency.

"Q. What else did he do? A. That's all he could do.

"Q. What alarms did he sound? A. Well, just short blasts in succession.

"Q. State whether or not they were given before the train struck him or afterwards? A. Before he was struck.

"Q. State whether or not Mr. Perry stop-

ped, looked and listened before he got on this track? A. No, sir.

"Q. What do you mean by that? A. He didn't notice either side of the track.

"Q. Did he keep right on? A. Yes, sir, just continued walking.

"Q. What chance, if any, did the engineer have to stop the train after he got on the track? A. Not any more than he did.

"Q. Did he make a good stop of the train? A. He did, he brought it to a stop as quick as he could.

"Q. Was there anybody else on this train? A. No, sir.

"Q. Was it an oil burner or coal? A. It was oil.

"Q. What cars were on this track? A. Not any.

"Q. State whether or not there was anything to hide the view of the engine of the train as it approached the crossing? A. There wasn't anything to prevent the man from seeing the engine.

"Q. State whether or not you saw a truck out there on the road? A. Well, I saw a truck standing on the highway just a little north of the crossing, on the right side, loaded with household goods.

"Q. State whether or not you continued to ring the bell until you reached the crossing? A. I did, until we were over the crossing."

Plaintiff bases her contention that the defendant had the last clear chance to avoid the accident upon the theory and the assumption that the movements of Perry indicated that he was coming upon the track unaware of the presence of the approaching train and that the defendant's fireman and engineer should have observed this fact and should have stopped the train before it reached the crossing. The law is plain that every one must stop, look, and listen before going upon a railroad track, and the employees of defendant operating its train on this occasion had a right to presume that Perry would stop before actually going upon the track. It is a fact known to all that many pedestrians and drivers of automobiles go just as close as possible to a railroad track before stopping to let a train go by. A careful reading of the record in this case reveals nothing to us that should have indicated to the engineer or the fireman that Perry was not going to do what the law required of him; that is, stop and discover the presence and approach of the train. If deceased was deaf or was lame, the obligation to be careful was all the greater. Defendant had no knowledge of these defects and infirmities, and cannot be required to exercise special care on account of them.

Granting, for the sake of the argument, that Perry actually went on the defendant's track ignorant of the danger from the oncoming train, the alarm whistle was sounded in time for him to have saved himself by getting off the track. His failure to save himself in this manner deprives the plaintiff of whatever benefit she might otherwise claim under the doctrine of the last clear chance.

There are numberless cases treating of the doctrine of the last clear chance and of the duty and obligation to stop, look, and listen before going upon a railroad track. One of the best statements of the doctrine is found in 20 R. C. L. "Negligence," § 114, and is as follows:

"The proposition has been formulated in a great many opinions that the negligence of a plaintiff will not bar him of recovery if it is shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the plaintiff's negligence. This proposition has been referred to some times as the doctrine of 'last clear chance,' sometimes as the humanitarian doctrine, and occasionally as the rule of Davies v. Mann. As it usually is expressed, a person who has the last clear chance or opportunity of avoiding an accident, notwithstanding the negligence of his opponent, is considered in law solely responsible for such accident. The supreme court of the United States thus lays down the doctrine of contributory negligence as modified by that of the last clear chance: 'Although the defendant's negligence may have been the primary cause of the injury complained of, yet an action for such injury cannot be maintained if the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution of the person injured, subject to this qualification, which has grown up in recent years: That the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence.' The doctrine really means, however, that even though a person's own acts may have placed him in a position of peril, yet if another acts or omits to act with knowledge of the peril, and an injury results, the injured person is entitled to recover."

We find and hold that the testimony in this case discloses that after the discovery of deceased's peril it was beyond the power of defendant's engineer to do anything to avoid the consequences of his, deceased's, negligence.

In the case of May v. Texas & Pacific Ry. Co., 123 La. 647, 49 So. 272, 273, the Supreme Court upheld a judgment of the district court, affirmed by the Court of Appeal, which rejected the demands of the plaintiff against the defendant. In that case the plaintiff invoked the doctrine of the last clear chance. One of the acts of negligence charged was that the defendant's train was going too fast,

just as is claimed in this case. In passing on that phase of the case, the court said: "Defendant's negligence was committed prior to plaintiff's negligence. At the rate at which the train was running, it was impossible for the engineer to avoid the collision after he saw plaintiff." So, in this case, if defendant's train was running too fast, which we do not think it was doing, this negligence was before the deceased committed his negligence by going upon the track as he did, and it was impossible to stop the train after deceased's peril was seen. Further on in this case the court said:

"The doctrine of the last clear chance has given rise to a number of discussions and to a number of varying and conflicting opinions. In this state the appellate courts were slow to embody the rule of the last clear chance in our jurisprudence. Of late years it has been embodied, to an extent at least, as part of our jurisprudence.

"But it was never the intention to hold that the pedestrian is under no necessity of being careful, and that he can walk on a track without hesitation and pursue his route as he might do on any ordinary road without looking. On the contrary, he should exercise his own faculties to a reasonable extent. * * *

"The negligence of the plaintiff contributed to his own injury. He was the last at fault.

"Reasonable care is required of one who goes upon the track of a commercial railroad, and each, the railroad and the passenger [pedestrian], is held to the exercise of reasonable care, and there is no exercise of reasonable care if the pedestrian suddenly steps without looking at all on a track not far ahead of a rapidly approaching train to continue his walk without giving himself any concern about the train.

"The pedestrian must be held to the necessity to 'stop, look, and listen'; and, while he will not be held to that necessity where it will serve no purpose, there are cases where failure to thus stop, look, and listen will defeat his recovery.

"The surroundings in this instance imposed that duty. He knew something of the track, must have known that a number of trains passed there during the day.

"It must be borne in mind that plaintiff was not placed in sudden peril by the negligence of the railroad company. He placed himself in imminent peril by not exercising his faculties. The train was in the open with nothing to obstruct his view."

In the case of Nolan v. Illinois Central Ry. Co., 145 La. 483, 82 So. 590, 593, it was held: "The mere happening of an accident does not raise the presumption of negligence on the part of a railroad company. The negligence of the company must be proved with certainty, and it must be shown that such negligence was the proximate cause of the accident. Persons using railroad tracks are held to the exercise of the care that the danger of the situation makes necessary; and a person about to walk upon a railroad track must look and listen for approaching trains; and where he fails to do so, and walks upon the track in such close proximity to an approaching train as to be struck by it before it can be stopped, he is guilty of such negligence as will preclude a recovery in damages for his death; and the fact that the train was negligently operated will not render the company liable."

In the case of Johnson v. Texas & Pacific Ry. Co., 16 La. App. 464, 133 So. 517, 521, 135 So. 114, this court said: "There is another legal principle which makes the doctrine of the last clear chance inapplicable in this case, even if it be conceded that defendant was negligent. Decedent, afflicted by infirmities, as he is shown to have been, should have exercised greater care and caution when on defendant's tracks than a person in full possession of his faculties and senses. He did not exercise the prudence the law required of him by keeping a lookout for approaching trains. His conduct on this score rendered him guilty of negligence, and this continued down to the moment of the accident. If the negligence of deceased is concurrent with that of defendant to the moment of the tragedy, no recovery will lie."

Applying the above citation to this case, if decedent were deaf and lame with an artificial limb, he should have exercised the greatest of care and caution before going upon the railroad track.

In the case of Saitta v. Yazoo & M. V. Ry. Co., 153 La. 1099, 97 So. 261, it was held: "Besides, although it was the duty of the engineer to give such signals, if he saw deceased was in a position of danger from which he was not reasonably preparing to remove himself, yet the former was justified in assuming that the deceased would use his sense of hearing so as to discover the approach of a heavy passenger train travelling 45 miles an hour and would get out of the way of the train."

Further in this same case the court said: "There was nothing to indicate that deceased would not do what dozens of people do every day, and that is step off the track and out of danger, when the engine came near enough to make it necessary."

■ The very presence of a railroad track is a solemn warning. It speaks louder and more eloquently than words that a dangerous instrumentality may pass over it at any moment, and, furthermore, this instrumentality is confined to that track. It cannot veer to the right or the left one hair's breadth. It is otherwise with an automobile or other type of vehicle. They may change their course at

will, and may be able to avoid a collision caused entirely by the fault of the other party. Perry was thoroughly familiar with the presence of defendant's railroad. He evidently knew the schedule of the trains; the road was straight; there were no obstructions of the view in either direction. He knew the danger of going in front of a moving train. Defendant's engineer and fireman had a right to think and believe that he would use his senses and would stop before getting on the track. In doing as he did his negligence continued down to the very moment he was struck, some seconds after the engineer had discovered his peril and had done everything possible to warn him and to save him from his negligent act.

In the case of the Baltimore & Ohio Ry. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 25, 72 L. Ed. 167, 56 A. L. R. 645, the court said: "When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk. If at the last moment Goodman found himself in an emergency it was his own fault that he did not reduce his speed earlier or come to a stop. It is true, as said in Flannelly v. Delaware & H. Co., 225 U. S. 597, 603, 56 L. Ed. 1221, 1222, 44 L. R. A. (N. S.) 154, 32 S. Ct. 783, that the question of due care very generally is left to the jury. But we are dealing with a standard of conduct, and when the standard is clear it should be laid down once for all by the courts. See Southern P. Co. v. Berkshire, 254 U. S. 415, 417, 419, 65 L. Ed. 335, 337, 338, 41 S. Ct. 162."

We have given the most careful and deliberate consideration to all the evidence in this case. The killing of Perry by defendant's train was a most regrettable incident, but the proximate cause of it was his own negligence in going upon the railroad track without stopping, looking, and listening in every direction, and in remaining upon the track even after the engineer had sounded the emergency alarm. His negligence continued after the engineer discovered his peril and after he had done everything in his power to save him. The engineer did not have the last clear chance to avoid the accident, but the deceased did, and failed to avail himself of it. Under the facts as we find them, the plaintiff cannot recover, and the judgment will have to be reversed.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, annulled, reversed, and set aside, and it is now ordered that the plaintiff's demands be rejected, and that her suit be dismissed, at her cost in both courts.

---

*Rehearing granted July 14, 1932.