Louis Lacour, the husband of Mary Lacour, and the father of the other plaintiffs herein, was struck and killed by a south-bound passenger (troop) train of the defendant company on its track at Derry station, in the Village of Derry, Louisiana, at about 5:30 o'clock A.M., June 15, 1944. The widow and heirs of the deceased instituted this suit to recover a large amount in damages on the theory that due to the negligence and carelessness of the crew in charge of the train the deceased met death.
Petitioners further alleged that when killed the deceased was attempting to flag said train so that it would stop at said station to enable him and his wife to board the same as passengers for Alexandria, Louisiana; that Derry is a flag station, which means that passenger trains stop there only when flagged; that the deceased began flagging the train while he was standing on the track between the rails when the train was a distance of nearly one-half mile away; that the train did not slow down or stop and that the foot of the deceased, in some manner unknown to *Page 335 
plaintiffs, got caught between the cross ties or under the rail and he was unable to extricate himself before the train ran over him. The accident, it is charged, was attributable to the gross negligence, carelessness and reckless disregard for human life on the part of the agents and employees of defendant company; that it was negligence not to have slowed the train in deference to it being flagged after seeing the deceased on the track; that the engineer and fireman on the train were maintaining a proper and careful lookout ahead at the time of or immediately prior to the accident, or else they would have seen the deceased in time to have avoided striking him.
Defendant denies that the tragic accident resulting in the death of Louis Lacour was to any extent due to the negligence or carelessness of its train crew, but, on the contrary, was solely attributable to the gross negligence of the deceased, himself.
It is further alleged by defendant that the train in question was not a regular passenger train, but a special one that was hauling several coaches of troops and was not taking on passengers at all, and for these reasons the operatives in charge of it did not try to bring it to a stop after observing the signal given by the deceased. Defendant admits that the engineer and brakeman (then at their posts of duty) did see the deceased on the track near the station, waving a handkerchief as a signal for the train to stop, when it was quite a distance away, but they assumed, as they had a right to do, that he would remove himself from a position of danger to one of safety as soon as he became aware that his signal was not being heeded; that the whistle of the train was blowing and the bell was ringing when it was many hundred feet away, and as it drew closer to deceased, he, having made no move to get off the track, the engineer sounded the whistle again and applied the brakes but the train was too close to be stopped in time to avert the impending accident.
Defendant further pleads that plaintiff's own negligence in the respects above mentioned, were the sole and proximate cause of the accident; and, in the alternative, his negligence is pleaded in bar of recovery by the plaintiffs.
Plaintiffs' demand was rejected and they appealed.
The facts of the case are, to great extent, not disputed. The above narrative of the pleadings clearly reflects them, so far as covered thereby, except it is not proved that the foot of the deceased was in some manner caught between the ties or under the rail. This being true, the implication arising from the allegation of the petition on this score is set at naught; that is, the deceased was not killed because he was unable to get off the track.
The testimony indicates, but does not definitely prove, that the deceased did step from between the rails, but did not get far enough from the west rail for the train to miss him.
The train in question consisted of thirteen passenger cars laden with troops and two cabooses, in addition to the locomotive. It was immediately prior to the accident moving at a rate not over fifty-five miles per hour. Going at this speed it requires from 1,500 to 1,800 feet to stop it.
It is shown that when approaching the place where the track is crossed by a gravel highway, over 1,800 feet from the depot, the customary blasts of the whistle were given. At this time the engineer noticed the deceased walking from the depot toward the track but, on account of a slight curve in the track just north of the depot, he was not able to tell if the deceased got on the track, but as the train drew closer he did observe that he appeared to move his position slightly westward. The engineer also observed that deceased was signalling the train to stop. He testified, and he is well corroborated, that there was nothing in the movements or actions of the deceased to indicate that he was abnormal in any manner or was not in full possession of his mental and physical faculties. In view of these facts, he assumed that the deceased would act as a normal person, and, for his own protection, would timely get out of the path of the train. However, when a distance of some three hundred feet from him and seeing that he had not attained a place of safety, the engineer *Page 336 
gave the alarm whistle, consisting of several short blasts, and applied the brakes as in emergency, but to no avail.
It required over three seconds for the train to cover said three hundred feet and had the deceased acted promptly he could have jumped to safety. Why he did not do this and why he continued to remain on the track, or so close to it as to be struck, is an unsolved mystery. He had on several prior occasions, near this same hour, flagged passenger trains at this station. It was daylight and it is obvious he was able to observe that the train as it approached him, was not slowing down in preparation for a stop. In addition, even to make the customary stop the locomotive and some of the cars would necessarily have passed the spot whereon deceased was standing. The train, after striking deceased, passed the depot and stopped some 1,200 feet below it.
[1] The undisputed facts exonerate the engineer and other operatives of the train from the charge of negligence made against them. They were not required to reduce the speed of the train to any extent simply because they observed Lacour on or near the track many hundred feet away, waving a handkerchief.
It is not of uncommon occurrence that people, especially boys, go upon railway tracks, wave their hats or any other thing in their hands, and remain thereon until the approaching train is near them, then jump to safety.
If trains that are expected to be operated on strict schedule should be required to stop or slow down in every instance when a person is observed by its operatives on the track, many hundred feet ahead, the schedule would be rendered largely worthless and the lives of passengers imperiled. This is vividly illustrated in the present case. The regular southbound passenger train was due at Derry only a few minutes after this accident occurred. Had the troop train consumed much time there the chances for a rear end collision would not have been impossible.
[2] The law is very clear that the engineer of a train has the right to assume that a person standing on or near the track ahead of him, apparently in full possession of his mental faculties and physical power, and who is aware of the train's approach, will get out of its way in time to avoid being hurt. See: Johnson v. Texas Pacific Railway Company, 16 La. App. 464, 133 So. 517, 135 So. 114; and cases cited therein; Patterson v. Yazoo M. V. Railway Company, et al., La. App., 187 So. 305; Young v. Thompson, La. App., 189 So. 487.
The jurisprudence of this state teems with cases holding as do these.
As a corollary to the above stated legal principle, it has been many times held that the law does not require that a train be slowed down or stopped simply because the engineer sees a person on or standing near the track, unless such person in some manner acts in such way as to impress the engineer and/or other operatives of the train that he is not normal or is not in full possession of his mental faculties, etc. See same cases cited above.
[3] Energetic counsel for the plaintiffs have provided us with lengthy brief, in which they elaborately discuss the facts of the case and in which an array of authorities relied upon to sustain their contentions are cited. We have given due consideration to this brief. The discovered peril and last clear chance doctrines are mainly relied upon. They do not attempt to excuse the palpable negligence of the deceased. The mentioned doctrines are not applicable to the facts of this case. It is doubtful if the train could have been stopped before striking Lacour after his presence on or near the track was first observed by the engineer. To apply said doctrines and condemn defendant in damages it would be necessary to hold that the deceased was in a position of peril when first seen by the engineer and that the train could and should have been stopped within the intervening distance. The record does not warrant us to so hold.
In legal contemplation, as regards a train's operatives, a person on the track many hundred feet away, is not in such a position of peril as to warrant invocation of said doctrine. To do so, it is obvious, would lead to absurd consequence. It would, mean that to avoid the danger of *Page 337 
running down persons so situated, the speed of the train would have to be so reduced that an accident could be avoided regardless of the movements of such person or persons. As a general rule such a proposition is applicable to motor vehicles but not to trains.
We are of the opinion that the lower court correctly decided this case and for the reasons herein given, the judgment appealed from is affirmed with costs.
KENNON, J., absent.