**TROTTER et al. v. TEXAS & P. RY. CO.***
No. 4508.

Court of Appeal of Louisiana. Second Circuit.

March 6, 1933.

Peterman, Dear & Peterman, of Alexandria, for appellant.

C. B. McClung and E. S. Prudhomme, both of Natchitoches, for appellees.

TALIAFERRO, Judge.

Lisso Trotter, a negro boy, age 20, was killed on the night of October 25, 1931, by defendant's west (north) bound passenger train No. 23, a short distance north of Hyams flag station, in Natchitoches parish. Tom Trotter, father of deceased, individually, and as natural tutor of his two minor children, Leola Trotter and Alfred Trotter, sister and brother of deceased, and Forrest Trotter and Tom Trotter, Jr., major brothers of deceased, bring this suit to recover damages for the death of the son and brother. They allege that the defendant's track at the point where Lisso Trotter was killed is straight for several miles and the view unobstructed; that said track is regularly and constantly used by pedestrians as a highway to the knowledge of the railway company, its agents and employees, and without objection by it or them; that deceased left his home with some companions, near Hyams Station, to visit a neighbor, and followed the public road until it crossed the railway track, which he adopted as a short cut to his destination; that he did not reach his destination, but was found dead on the track about 9 o'clock p. m. on said day. It is further alleged that had the engineer used diligence and care he could have avoided the accident, and that it occurred because of the gross carelessness and negligence of the said railway company, its agents and employees. No specific acts of negligence or carelessness are alleged.

Defendant denies that Tom Trotter was married to the mother of Lisso Trotter, deceased, and therefore that none of plaintiffs have any right of action on account of his death. It is admitted that its passenger train No. 23 struck and killed Lisso Trotter at the

*Rehearing denied March 31, 1933.

place and time alleged by plaintiffs. Negligence and carelessness on the part of the train crew in connection with said killing are denied. Further answering, defendant says that said train No. 23 was on its way from New Orleans to Shreveport, and as it approached Hyams Station, for which it was not scheduled to stop, the engineer blew the station whistle and then sounded the crossing whistle at or near the public crossing at Hyams depot, and further says:

"That after leaving Hyams and moving around a curve at that point, and after the engine had reached a straight stretch of track, the engineer saw an object six or eight hundred feet ahead of him resembling a piece of paper or a clump of grass or similar object; that leaning out of the cab window before the train reached said object and when the front of the engine was about 30 feet from it, the fireman called to the engineer who then applied the brakes, shut off the steam, opened the sand and made service application of brakes, but before the train could be brought to a halt it had passed said object; that after the train was stopped and the trainmen returned to the spot where this object had been seen, it was discovered to be a human being, later identified as Lisso Trotter; that not only did the engineer sound the whistle as above set out, but the bell on the engine, automatically operated, was ringing from the time the train passed Hyams until it stopped; that the engineer and fireman, of said train were at their post of duty in the cab in the engine; that said train was equipped with all modern appliances which were in complete order and operating efficiently; that the electric headlight of the locomotive was burning; that said train was moving at a speed of between 45 and 50 miles an hour; that the section of the country where the accident happened is heavily wooded with growing timber on each side of the track and is sparsely populated; that the said train consisted of, besides the engine and tender, several coaches; that said train weighed not less than 700 tons; that it was impossible to stop said train in a distance less than 1000 feet; that the said Lisso Trotter was a trespasser on respondent's right of way and tracks; that there was no fault or negligence of any kind on the part of any of respondent's employees in charge of said train; that the striking of and fatal injury to the said Lisso Trotter was due either wholly to the fault and negligence of said Trotter, or that he materially contributed thereto and brought about the accident to himself by his own fault and in consequence thereof respondent is not liable in law to the said plaintiffs upon their demands as made in this suit."

The lower court gave Tom Trotter judgment for $5,000, and rejected the demands of the other plaintiffs. Defendant has appealed.

Tom Trotter only has answered the appeal. He asks that the judgment in his favor be increased to $14,976.

None of the documentary evidence introduced at time of trial is in the record. Photographs were taken of defendant's track north from a position 700 feet south of spot where Lisso Trotter was killed, but these are omitted from the record. The record evidence of issuance of marriage license by the clerk of court at Natchitoches authorizing the celebration of marriage between Tom Trotter and his deceased wife, Lula Thomas, though offered in evidence, is also absent from the record. The omitted evidence would be of considerable assistance to us in considering the case.

It appears that the marriage records of Natchitoches parish contain a record of the issuance of a license which Tom Trotter obtained from the clerk of court authorizing his marriage to Lula Thomas. As no copy of this record is before us, we assume that the license was not returned to the clerk after the celebration of the marriage. The minister of the gospel who officiated at the wedding failed to properly make up and have signed the act of celebration, or failed to return it with the license under which he acted, if it was properly filled out and signed by him, the witnesses, and contracting parties. It is not seriously denied that this license was, in fact, issued. One witness was introduced, who swore he was present at the marriage of Tom Trotter and Lula Thomas, which occurred over thirty years ago. Another witness, the widow of the officiating minister, is living but did not testify at the trial. All other witnesses are dead. Tom testified that he bought a license from the clerk of court of Natchitoches parish, and was married by a minister the day following. These parties have lived in Natchitoches parish all their lives. Lula Thomas died about one month before her son Lisso Trotter was killed. She and Tom lived together as man and wife and had five children who survived her. The evidence in support of the marriage, under recent decisions of the Supreme Court, is sufficient to establish it. The case of Savannah Duty v. Fowler Commission Company, Inc. (La. App.) 146 So. 336, this day decided by us, involves the question of marriage where neither license nor act of celebration were produced or accounted for. This marriage was held to be established on the testimony of two witnesses who stated that they were present when it took place, coupled with proof of cohabitation as man and wife for 25 years immediately following the marriage. In that case we have reviewed at considerable length the jurisprudence of the Supreme Court on this important question, and followed the most recent decision of that court on the subject, that of Succession of Anderson, 145 So. 270.

The allegations of defendant's answer,

quoted by us above, are fairly well established by the evidence in the case.

The deceased was addicted to the drinking of strong liquor. A few hours before he was killed he was seen staggering on the highway, showing unmistakable signs of having imbibed too freely. He was seen and talked to by a colored woman at Hyams Station at ten minutes past 8 o'clock. He was killed at two minutes after 9 o'clock—not over 700 yards from this flag station. He had walked with this woman down the track to the station, and then proceeded up the track in the direction from whence he had come. She detected he had been drinking, but he had no difficulty in walking. He evidently was overcome by drowsiness and lay down between the rails of the track and fell into sound sleep. The train that killed him consisted of seven passenger coaches, 70 feet long each, and engine and tender. It was making the run from New Orleans to Shreveport, and was moving at the rate of around 50 miles per hour. It stopped at Natchitoches, several miles south of Hyams flag station, and was scheduled to stop next at Grand Bayou, 34 miles north of Natchitoches. It did not stop at Hyams, but the regulation signals, the blowing of the whistle and ringing of bell, for this station and the highway crossing near it, were given by the train crew as these places were approached. Beginning at, or a short distance north of, Hyams Station, the railway track describes a slight curve. The train struck Trotter 495 feet north of the northern end of this curve. Both sides of the right of way from or near Hyams to the place where the body was found, are lined by timber, though, for the most part, in that part of the country, farms and plantations adjoin the right of way.

No one saw the accident except the engineer and fireman of the train. The engineer was asked what, if anything, he saw on the track as his train was coming out of the curve above Hyams, and he answered:

"I saw an object between the rails and first thought it was a wad of paper and then I thought it was part of animal pelt, but I never was able to tell what it was."

He never did recognize the object he saw ahead as that of a human being. When the train was within fifty feet of the object, the fireman stated to him that he believed it was a "body," and immediately the emergency brakes were applied. The entire train passed over the body before being stopped. The crew got off the train and walked down the track to where the body was. The train was then backed down to Hyams Station, where the section foreman was living. He was instructed to look after the body and notify his relatives, which was done. The engineer further stated that when he first noticed the deceased on the track the train was not over 600 feet from him, and at the speed the train was

then going it could not have been stopped within that distance. After application of the emergency brakes, the train moved between 1,300 and 1,400 feet before it came to a stop. The testimony of the engineer is corroborated by that of the fireman. Both state that they were keeping a close lookout over the track ahead, and discovered deceased between the rails immediately after the train came out of the curve, though neither recognized what they saw as being a human, due to the compact condition of the body. It is shown that the apparatus for stopping this train within the shortest possible distance, when moving rapidly, was in good condition. The headlights were functioning properly. The night was bright; the moon and stars were shining.

The evidence in this case leaves no doubt in our minds that regardless of the efforts that might have been put forth by the train crew to stop the train after discovery of deceased's body on the track ahead, the accident would have happened. We are also convinced that the presence of deceased on the track was discovered by the engineer and fireman as soon as possible under the circumstances, and this discovery was made immediately after the train came out of the curve north of Hyams, where and when its lights could focus straight up the track. The evidence is also convincing that deceased, within forty minutes before he was killed, was not drunk to the degree that he did not know what he was doing. Whether he drank any after parting company with the negro woman at Hyams, a few moments past 8 o'clock, no one knows.

The facts of this case are not as strong for plaintiffs as generally appears in the long line of cases wherein pedestrians on railway tracks have been run down and killed by trains, and no negligence was found by the courts on the part of the train crews.

In the majority of cases, one or more members of the train crew discovered the deceased on the track at a distance within which the train could be stopped if efforts to do so had been immediately undertaken, but such was not done because either the crew did not recognize the object ahead of the train as a human being, or assumed from its movements that it would get off the track before being struck.

 It is not required by law, and it would be unreasonable to require, that a train be slowed down or brought to a stop each time an object, or even a person, is observed on the tracks ahead. To so require this of trains, especially rapidly moving passenger trains, would make impossible their operation by schedules. The fact that the tracks of a railway company, in the open country, are used by pedestrians, does not entail upon it the obligation of operating its train thereon under such control as to make it impossible to run over and kill pedestrians who conceive

**368**

the right to use such tracks to walk on, or to sleep upon, when weary or intoxicated. A railway company owes no duty to a trespasser on its tracks, in the open country, save to not wantonly kill him. In the discharge of this duty ordinary care only need be exercised.

The recent case of Sorey v. Yazoo & M. V. Ry. Co., 17 La. App. 538, 136 So. 155, is stronger, on the facts, for plaintiff than the case at bar. In that case plaintiff's son was killed in the daytime, but his suit for damages was rejected.

The case of Johnson v. T. & P. Ry. Co., 16 La. App. 464, 133 So. 517, and 135 So. 114, reviews at length the jurisprudence of our courts applicable to cases of the character we are now considering. In that case the deceased was recognized walking down the track in daytime by the engineer of defendant's train at a distance within which the train could have been stopped. It was held that deceased was a trespasser on the railway's track, and was so negligent as to bar recovery for his death.

In the present case the deceased undoubtedly was in possession of his mental faculties to such extent that he realized he was on the track of a railway company over which he knew trains were operated at high rate of speed. The fact that he selected the track as the shortest route to his destination indicates clearly his power of discrimination. He knew that if he fell asleep on the track and a train passed he would be killed. If he chose to use the track as a road to walk on, he was bound to know that it was his duty to watch for the approach of, trains, rather than for trains to watch for his presence. His own negligence bars plaintiffs' right to recover.

For the reasons herein assigned, the judgment appealed from is annulled, avoided and reversed, and plaintiffs' suit is dismissed, at their cost.