**RICHARD et al. v. BALDWIN et al.**

No. 1571.

Court of Appeal of Louisiana. First Circuit.

May 8, 1936.

Dubuisson & Dubuisson, of Opelousas, for appellants.

Milling, Godchaux, Saal & Milling, of New Orleans, for appellees.

LeBLANC, Judge.

Albert Richard, sixty-three year old negro farmer, was killed by a train of the New Orleans Texas & Mexico Railway Company, shortly after 11 o'clock on the night of October 8, 1934, at a point some 2 to 3 miles east of the station at Opelousas. Claiming that the decedent was killed because of certain acts of one of the members of the train crew which constituted gross and almost criminal negligence, his widow, Mary Grice, and his son Louis, who alleges that he is a minor, plaintiffs herein, have instituted this suit to recover damages on account of his death. The demand is for the sum of $17,000 of which $11,000 is asked for by the widow and $6,000 by the so-called minor. It is alleged that the defendant railroad company was involved in bankruptcy proceedings at the time of the alleged accident and the suit is therefore filed against the two trustees in bankruptcy.

The specific act charged against the train operator as having caused the decedent's death consisted in the unnecessary letting out of steam from the side of the locomotive as it passed him while walking alongside of the track, and blowing it on him in such way as to have scalded him about the face and causing him to fall into the side of the locomotive or tender, and then being thrown violently to the ground by force of the impact, from all of which he suffered injuries which caused his death almost instantly.

Defendants, for answer, deny negligence in any manner on the part of the train crew and deny that the decedent met his death in the way as alleged in plaintiff's petition and aver that same was caused wholly and entirely by his own negligent action, without, however, specifying any act of negligence on his part.

On the issue as thus made the case went to trial in the district court and resulted in a judgment in favor of the defendants, dismissing the suit of the plaintiffs at their costs. From that judgment, this appeal was taken.

This is a case which depends entirely on the credibility of either one of two witnesses. One, a negro by the name of Freddie Savoy, who testified on behalf of the plaintiffs and the other, a white man named J. W. White, the engineer who was running the locomotive on the night of the accident,

who was the defendant's witness. These are the only two witnesses who claim to have seen the accident happen, and as their versions are entirely different, it becomes necessary to accept either the one or the other to decide the issue of negligence. If Savoy's version is believed in any way, then the defendant is liable. If White's is the accepted story, then there is no liability. The district judge evidently rejected Savoy's testimony as he decided in favor of the defendant. He assigned no written reasons for judgment and we therefore do not know why he disbelieved him. The record contains absolutely nothing to indicate that he was unworthy of belief, and as his account of the accident is as plausible as is that of the engineer, and as it appears to us that it is difficult, if not impossible, to reconcile the latter's version of how the decedent received a blow to his head when the actual injuries he is shown to have sustained are all to other members of his body, we have concluded that the weight of the testimony is on the plaintiff's side and that consequently the defendant is liable.

Freddie Savoy is twenty-four years old and a reading of his testimony impresses us with the fact that he is a negro of the average country negro's mentality. He is absolutely disinterested and seems to have no reason whatever for having concocted the story which he told concerning what happened.

He states that on the night of the accident, which was a Monday, he met the decedent at a circus in Opelousas and in the course of conversation decedent mentioned that he was going to his son Louis' home to see the latter's little child who was sick. This son's home was in the same direction in which he (Savoy) lived so he told him, "You and me will be going the same way," and the old negro answered, "Yes." So, they set out together on foot and got on what is known as the Camp Hamilton road out of Opelousas. They walked along that road until they reached the point where it crosses the defendant company's railroad track. From that point they were to follow the path along the railroad track. Savoy says that there was something in his right shoe, probably a piece of gravel which was causing him some discomfort, so when they reached the Camp Hamilton railroad crossing he stopped to take his shoe off and told the old darky to keep on, that he would catch up with him. Next to the crossing, on the east, there is a cattle guard which pedestrians, following the track, have to cross in order to get back into the footpath. The decedent had successfully gone over this cattle guard and was on his way beyond when Savoy finished clearing his shoe of the foreign particle which was bothering him and was ready to continue on his walk. He then saw the train coming in his direction and, as a matter of prudence, waited for it to pass by him before attempting to cross over the cattle guard. He says that as the locomotive passed by him steam was emitted from the side and that caused him to run down the embankment. As he did so, he turned around and looked in the direction of the old man and saw him whirling around in a cloud of steam and fall into the side of the locomotive. He saw the train stop right afterwards and back up to where decedent had fallen. Some of the train crew came out of the train and looked at him. He himself became frightened he says and instead of going to the scene of the accident he thought it better to hurry to Louis', the old man's son's, house and give the alarm, which he did. When he returned to the place of the accident with Louis, he found the coroner, Dr. Littell, and Mr. J. M. Shaver, defendant's local agent at Opelousas, looking for the body of the decedent and he located it for them.

The witness Savoy was subjected to a rather severe cross-examination by counsel for the defendant, but never varied one particle from his version of the accident as we have substantially stated it. The only contradiction to his story is to be found in the testimony of Mr. White, the engineer whose account of the happening we now give in substance.

Mr. White says that his train consisted only of the engine and a caboose which he was taking to Port Barre to make what he refers to as a "Port Barre turn." As Port Barre is the eastern terminus on that run, we take that to mean that he was going there to turn his train around so as to head west on his next trip. The crew consisted of himself, who was seated in the engineer's station on the right-hand side of the locomotive, the fireman, on left-hand side, the conductor, and two brakemen who were in the caboose.

He says that they were going about 35 miles an hour with a good headlight burning. As he approached the Camp Hamilton road crossing, he sounded the crossing whistle. He estimates that he started blowing the whistle 100 yards west of the crossing. The distance from the crossing to

the cattle guard is 100 feet; the cattle guard itself is 7 feet wide and the decedent's body was located two rail lengths, or about 66 feet, east of the cattle guard. The distance from the crossing to the point where he was struck may therefore be said to have been approximately 173 feet.

The engineer says that when he went over the crossing he "didn't see anything in the way of a person," but that when he got nearly to the cattle guard he saw an object on the side of the track and couldn't make out what it was. He seems to have thought it was a cross-tie lying along side of the track. It was only when he reached the cattle guard that he "raised up and looked out of the side window" and realized then that what he saw was a human being. He applied the emergency brakes at once but it was too late to stop the train before striking the decedent, who, according to his further testimony, he surmised was lying perpendicularly to the south rail with his head reclining on a folded coat which was found next to the rail and which he evidently was using as a head rest or pillow. In this last part of his testimony regarding the coat, neatly folded with a depression right in the center, being found next to the rail, the engineer's version is supported by some of the members of the train crew who also got off to view the body and the locus.

Assuming that the engineer's account of the accident is the true one, it would seem that it took him a long time to perceive an object in such close proximity to the track and to take more precaution in ascertaining what it was and if there was danger in approaching it. With his headlights burning brightly as they were, it is difficult to understand why he did not see it before he was only about 70 feet from it and even then did not discern what it was as he says that it was only on passing over the cattle guard, shown to be only some 60 feet away, that he realized that what he had seen was a human being.

But the fact that the fireman in the same cab with him, and who had the same opportunity of seeing on the right of way ahead of them, testifies that he was watching closely in front, and did not see anything on the right of way, makes the engineer's story a bit doubtful. It is true that seated on the left side of the cab, the front part of the locomotive might obstruct the fireman's vision to the right when they are very near the object, but certainly for 70 feet or more from the object he has the same field of vision of the whole right of way as has the engineer.

With regard to the decedent's coat being found, folded over and with a depression showing where his head might have rested, the engineer's testimony on this point, which after all is more or less of a supposition, is corroborated by two other members of the train crew who got down from the train to examine the place, but a fourth member of the crew with them says nothing about that, and besides, other conflicting testimony by some of plaintiffs' witnesses regarding the finding of the coat creates still more doubt on this important point in the case.

What in our opinion casts the most suspicion over the engineer's story, however, is the fact that although from his recital it would have been impossible for the decedent to have been struck on any part of his body but the right side, and most probably on the right side of the skull, from the position he describes him as being in, an examination of the body when it was being prepared for burial by the undertaker revealed that there was no blow to the head and that all the fractured members of the body were on the left side. The left arm was broken, and so were the left clavicle, the left leg, between the hip and the knee, and all the ribs on the left side of the spine. This is a physical fact, which, standing uncontradicted, leaves us with the impression that the engineer's version as to how the accident happened is highly improbable.

On the other hand, the account given by the witness Savoy is entirely plausible. He is corroborated to the extent that he and the deceased were seen leaving the circus together the night of the accident, and as it is shown that the entire train crew left the body alone to go to Port Barre to notify the agent at Opelousas to summon the coroner and the local agent, and that when these two came to the scene there were several negroes already there and that he (Savoy) was the one who located the body for them, the only reasonable inference to draw is that he was the one who gave the alarm, as indeed he testifies he did when he ran to the old man's son's house to notify him immediately after he saw what had happened.

There is some testimony to the effect that one of the decedent's shoes was off his foot when his body was found and that the heel was broken off. Something is said in argument and in brief about the possibility of

the deceased having his foot caught in the cattle guard as he crossed over it. But what connection such a possibility might have had with either version of the accident appearing in the record, we are unable to determine.

The plaintiff's theory is that the steam from the locomotive in which the deceased was enveloped was purposely emitted with the view of frightening him. We do not say that it was or was not. The fact remains, however, if Savoy's story is accepted, that he saw the old darky whirling around in the steam and fall against the locomotive. Granting that it was not done purposely, with every opportunity he had of seeing ahead and of observing this man along the right of way, the engineer in charge of the locomotive should have used every precaution to pass him by in safety, and if it was necessary to have to emit steam at that point, he should at least have stopped for the second or two that it took to do so.

Taking into consideration all the facts and circumstances as we view them, the interest of the defendant's witnesses as against the absolute lack of interest of the witness Savoy, we are unable to agree with the conclusion reached by the district judge on the question of liability.

We are of the opinion, however, that the demand made by the plaintiff Louis Richard has to be denied. By the terms of the petition itself, it is made on the ground that he is a minor, but the evidence shows that at the time of the accident and resulting death of his father he was over eighteen years of age and married. He was therefore, under the terms of Revised Civil Code, art. 382, relieved of all disabilities which attach to minors. Under article 2315 of the Code, the right of action which he is here attempting to exercise accrues only to the surviving spouse and minor children, in the event of the death of either of the spouses. The demand made by him therefore has to be rejected.

With regard to the claim of the widow, we are of the opinion that an award of $4,000 will justly compensate her for the demands she has made. The testimony on this point is very meager and the award we are making we believe to be in line with those usually made in cases of this character.

For the reasons herein stated, it is ordered that the judgment appealed from be affirmed in so far as it rejected the demand of the plaintiff Louis Richard and in so far as it rejected the demand made by the plaintiff Mary Grice, widow of Albert Richard, the deceased, it is now ordered that the judgment be avoided, set aside, and reversed, and it is now further ordered that the said plaintiff have and recover judgment in her favor and against the defendants, in the full and entire sum of $4,000, with legal interest from date of judicial demand.

It is further ordered that the defendants pay all costs of these proceedings.