**MILLER v. BALDWIN et al.**

**No. 1801.**

Court of Appeal of Louisiana. First Circuit.

Feb. 15, 1938.

Milling, Godchaux, Saal & Milling, of New Orleans, for appellant.

Guillory & Guillory, of Ville Platte, and George M. Wallace, of Baton Rouge, for appellee.

OTT, Judge.

Venton Miller, the twenty-one year old, unmarried son of plaintiff, was run over and killed by a west bound passenger train of the defendant railroad on the morning of February 7, 1934, at about the hour of 2:30 o'clock a. m. The deceased was struck and run over while lying on the railroad track in a drunken stupor, having lain down on the track on his way home after attending a dance, and after having lost his way in returning home, evidently because of his drunken condition. The accident occurred a little more than a quarter of a mile west of the town of Eunice—that is west of the corporate limits of this town, between the Basile highway crossing and what is known as the Fruge crossing. The former crossing is about 1¼ miles west of the passenger station in the town of Eunice, and the latter crossing is some 1,600 feet east of the former, that is something less than a mile from the passenger station, and about a quarter of a mile from the corporate limits of the town.

Plaintiff sues for $15,000 damages. The case was tried and the testimony transcribed before the then presiding judge retired from the bench, and the succeeding judge recused himself for good cause, and appointed Hon. Seth Lewis, a member of the St. Landry Bar, as judge ad hoc, to whom the case was submitted and who rendered a judgment in favor of plaintiff for $7,000. From this judgment, the defendant has appealed.

Plaintiff concedes that the deceased was guilty of contributory negligence in lying down on the track in a drunken condition, but contends that the railroad should be held liable for the death of his son on the ground that the operatives of the passenger train that killed his son were guilty of negligence in running at an excessive rate of speed in a section of country that was thickly populated and where pedestrians habitually used the tracks, to the knowledge of the railroad employees, and at a point where several highways crossed the railroad in close proximity to the point where the deceased was killed. It is alleged that the railroad track is crossed by three main highways and three lane crossings between the said Basile crossing and the depot in the town of Eunice. That the train could have been stopped in time to avoid striking the deceased had the operatives been keeping a proper lookout and had been going at a reasonable rate of speed. The answer of defendant is in the nature of a general denial of negligence, and sets up the negligence of the deceased as the cause of the accident.

The railroad track for more than a mile in both directions from the point where deceased was struck is perfectly straight, and the roadbed between the tracks or rails has gravel up even with the ties. There are some discrepancies in the testimony as to the exact point on the track where deceased was struck and the distance the body was dragged after being struck, some of the witnesses placing the

point at which the blood marks began near the Fruge crossing, while others place this point further west toward the Basile crossing. While this point is not of a great deal of importance, yet we think the preponderance of the evidence indicates that the deceased was lying on the track and was first struck by the train a few yards west of the Fruge crossing, and the body was dragged from 75 to 150 yards further west toward the Basile crossing. The right of way of the railroad was fenced along the tracks where the accident occurred, and cattle guards were placed at the crossings in the vicinity.

In determining the nature of the country in the vicinity of the point where the deceased was killed, and in arriving at the degree of care required of the operatives of the train in that section with reference to trespassers on the tracks, three vital considerations enter into the case.

The first consideration is the extent to which the tracks were used by pedestrians as a footpath in going to and returning from the town of Eunice. The preponderance of the evidence is to the effect that the tracks from Basile crossing into the town of Eunice were used very extensively and frequently by pedestrians both day and night. There were so many witnesses who testified to this fact that we can hardly disbelieve all of them without indicting the residents of almost the whole neighborhood with false swearing. While we are not in position to know the character and standing of the witnesses who testified on this point as was the judge ad hoc who decided the case below, yet we notice that among the witnesses who testified to this fact were Dr. Garland, acting coroner, Mr. Brunson, a justice of the peace, and many others, evidently leading citizens of the community. From the testimony of these witnesses, we think it can be safely concluded that at least as many as twenty or thirty people used the railroad tracks daily in going to and returning from the town of Eunice, and in fishing along the right of way. Not only did these pedestrians use the tracks during the daytime, but many persons used the tracks at night, several witnesses testifying that they themselves had been on the tracks at night and had seen others on the tracks, as late as midnight and after.

The evidence also shows beyond question that there is a well-defined and easily observed footpath beaten out along the side of the rails for a distance of a mile and a half—that is from Basile crossing into the principal part of the town of Eunice. This fact indicates that the railroad was used by many pedestrians as a pathway, and had been so used for many years, and the effort of the defendant to disprove this fact is, in our opinion, both feeble and unconvincing.

The engineer of the train denied that he had ever seen any pedestrians on the track near the point where the accident occurred, notwithstanding the fact that he had been on that railroad for some twenty years or more, and had passed over the locality of the accident as engineer on a train going east at 1:48 o'clock in the afternoon and at 2:30 a. m. in the morning going west every two or three days for many years. He says that he has never seen any person on the tracks at night except near the depot, and admits that he has seen two or three people some days on the track nearer town than the point of the accident. The fireman, who had been on these runs for some fourteen years, even says that he had never seen a person on the tracks in the vicinity of the accident; that he had seen only a few cars crossing the Basile crossing at night. The section foreman, who had been over this section of track almost daily for several years, says that people do use the tracks to walk on in the daytime occasionally, but he does not know if they use them at night.

In view of the fact that the decided preponderance of the evidence shows that the tracks were used so frequently from the Basile crossing into town as to make a beaten path, we cannot believe that the fireman and the engineer going over this route so many times had seen no pedestrians on the track. There is no reason why they could not see the path along the side of the rails right in front of them as they propelled their locomotives over the rails, and obviously, if people walked along this path, they saw them from the cabs of the engines.

The next point to consider is the nature of the country near the point of the accident. In our opinion, the preponderance of the evidence shows that the country adjacent to the point where the accident occurred is not what might be called open, woodland, or sparsely settled rural country to the extent of placing it in that class where the railroad is relieved of the necessity of using anything more than ordi-

nary care in the operation of its trains through such country. If we use as a criterion a radius of a mile or slightly more in each direction from the point of the accident—excluding those who live within the corporate limits of Eunice—the preponderance of the evidence shows that at least fifteen or twenty families live within this radius. If we take the testimony of two witnesses for the plaintiff alone, Mr. Paul Courville and Oremel Savoie, this fact is established beyond question. We know of no reason why their testimony should not be believed, especially in view of the fact that it is corroborated by such a large number of other witnesses, equally as reliable as far as the record shows. The first of these witnesses named about ten families living within this radius of the locus in quo, besides several tenant families. The other witness named also gave the names of several families living in this vicinity, as did Mr. Joe Fruge and others.

Defendant introduced in evidence several photographs of the locus in quo for the purpose of showing that the adjacent country is sparsely settled. But we are of the same opinion, as was the judge ad hoc, that the photographs give too narrow a range of vision to be of any great deal of service in this connection. Even on these photographs, focused as they were within a narrow range of vision, there appear several houses and human habitations. These photographs cannot overcome the overwhelming testimony by people who live in the neighborhood as to the location of houses along the railroad track and adjacent thereto. Defendant offered in evidence a map made by one of its engineers, which undertakes to show the residences within a distance of 1,200 feet on either side of the track. But it appears that most of the houses are just without this range of territory. Joe Fruge, who saw the pictures and the map, says that they do not show all the houses near the railroad as the range of vision is too small, and the map does not show his house, although he does not live far from the Fruge crossing, and only about a quarter of a mile from the place where the boy was killed.

In the third place, the evidence shows that there are several road crossings within a mile or so from the point where the accident happened. This indicates that the community is thickly settled and many people pass and repass over these crossings daily. The engineer testified that he had to blow the whistle for road crossings almost constantly from the time he left the town limits until he passed the Basile crossing.

These three factors—the use of the tracks by pedestrians, the number of habitations in the section outside the town limits, and the frequency of road crossings—go to place the locus in quo in that category where the operator of a railroad passenger train is required to keep a closer lookout for obstructions on the track in the way of incapacitated human beings than in the open and woodland country where such persons would not reasonably be expected to be found.

According to the engineer and fireman, the deceased was lying between the rails, with no part of his body lying on either rail. If we accept their statement on this point, it is clear that the body of the deceased extended several inches above the height of the rails. The gravel was level with the ties, and as the rails are only about 5½ inches high, it follows that a human body of the size of the deceased would extend several inches above the top of the rails. The engineer says that the train was traveling around 45 or 50 miles per hour at the time of the accident; the fireman places the speed at 50 miles per hour. The track was perfectly straight, the headlight in perfect order, and all the equipment was in good order. The train was not a long one, there being only five passenger coaches.

The engineer says he saw an object on the track, between the rails, which looked like a piece of brown paper, when he was within 300 or 400 feet of the object. In normal weather, he could see 800 to 1,000 feet ahead by the headlight, but says that on that night there was some fog or mist, and he could not see that far ahead. While there is no evidence in the record to show that an object as large as a human body, lying between the rails, on light gravel, with a good headlight, could not be seen for more than 300 or 400 feet, yet experience and common observation would indicate that such a large object, with such favorable circumstances, should be seen at a much greater distance. Of course, we are aware of the fact that the density of the mist or fog would have much to do with the extent and range of vision, but there is no testimony to show

just how foggy or dense the night was. It remains a fact that the more dense the mist, the greater was the care required of the engineer and fireman in operating the train over the tracks frequently used by pedestrians, with many residences not far distant, and the whistle blowing for one crossing after another. It is a well-known fact that the headlights on a passenger locomotive have a strong glare and long range, well calculated to penetrate very readily a light mist or fog for some distance.

There are several discrepancies in the testimony of the engineer and the fireman that weaken their testimony to a large extent. The former says that just as he passed the object on the track, the fireman looked out (why he was not looking out before does not appear). The engineer said to the fireman: "What is that?" to which the fireman replied, "I don't know," and then the engineer said, "It looked like a piece of paper or something run over," and the fireman said, "Yes." The fireman tells of this conversation quite differently. He says that he saw this dark object on the track when the engineer was blowing for the crossing, and the engineer asked him what it was, and he, the fireman, replied, "It looks like a piece of paper or something, it didn't move." So the engineer says that he is the one that said the object looked like a piece of paper, while the fireman says that he (the fireman) is the one who made this observation. But the most noticeable discrepancy in their testimony is on a point on which it would seem that there is no occasion for a difference. The engineer says that the regular signal for a road crossing is two long whistles, one short and a long, starting the whistle something over 1,300 feet from the crossing; the fireman says that such a signal is two shorts, two longs and one short, and then hold it until the train is over the crossing. The engineer says that he can see 800 to 1,000 feet ahead on a clear night; the fireman says he can see from 1,200 to 1,400 feet on such a night. The fireman says he could see about 900 feet ahead with a little fog or mist; the engineer says that on the night of the accident he could not have seen a cross-tie across the rails more than 300 or 400 feet ahead.

Of course, these discrepancies in some respects are not so material to the extent that they seriously affect the question of negligence, but they do give some guide by which the testimony of these two witnesses is to be weighed as a whole. If we take the testimony of the fireman as to the range of the headlights on a clear night, 1,200 or 1,400 feet, and take the testimony of the engineer on the distance required to stop the train at the rate of speed he was traveling, we find that the engineer could stop the train going at that speed within the range of his headlights. So if there had been no mist (assuming that there was some mist), the engineer should have seen this large object on the track, projecting above the rails, in time to stop the train before striking it. It there was a fog or mist on that night, partly obstructing the vision of the operators of the train, there was need for a reduced rate of speed and a closer lookout to guard against such emergencies as happened that night.

There has grown up in the jurisprudence of this state three distinct and well-defined rules relative to the duty of the operatives of a train in regard to trespassers on the track. The first of these is that, where a grown person, apparently in the full possession of his faculties, is walking on the track in front of an approaching train, the engineer is not required to slow down or stop for such person, after giving proper signals, as he has a right to assume that such a person will heed the signal and get off the track before the train reaches him. His duty to use all available means to stop his train only arises when he ascertains that the person on the track is unaware of the approach of the train, or has placed himself in a place of danger from which he is unable to extricate himself. Cases of this kind are illustrated by the case of Johnson v. Texas & P. Ry. Co., 16 La.App. 464, 133 So. 517, 135 So. 114, and the case of Russo v. Texas & P. Ry. Co., 177 So. 478, recently decided by this court.

The second class of cases is where a person goes to sleep on the track, or gets intoxicated and lies down on the track, thus changing his active negligence to a kind of passive negligence, and the locality where he thus places himself in a place of danger on the track is a rural section or sparsely settled community, and at a point where the operatives of the train could not be reasonably expected to find such a person on the track, the engineer is not required to keep the train under such control so as to stop within the range of the headlights, but may take it for granted that there is no human

obstruction on the track. This class of cases is illustrated by a large number of cases in our reports, many of which are cited by counsel for defendant and relied on in this case, the most pertinent being: Rogers v. Louisiana Ry. & Nav. Co., 143 La. 58, 78 So. 237; Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 177, 178, 78 So. 438; Trotter v. Texas & P. Ry. Co., La.App., 146 So. 365; Pinckley v. Texas & P. Ry. Co., La.App., 165 So. 504.

And the third class of cases, under which the majority of the court has decided that this case comes, is where a person lies down on the track and, from sleep or intoxication, becomes unconscious of danger, and the locality where such person thus places himself in a place of danger, is in a populous city, urban section, or in a community where people frequently use the tracks as a footpath, and where there are several habitations and highway crossings, much greater care is required on the part of the operators of the train, and a greater responsibility is on them to keep a lookout for persons who may reasonably be expected to use the tracks for walking thereon, and who may be expected at times to lie down thereon and become unaware of their dangerous situation. The same rule applies to those who might become entangled on the track, or be unable to get off the track by their own power of locomotion. In such a situation and in such a locality, the operator of the train must regulate his speed so as to be able to stop his train on the sudden appearance of a human being on the track in an incapacitated condition. This class of cases is illustrated by the cases of Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708, and Jones v. Chicago, R. I. & P. Ry. Co., 162 La. 690, 111 So. 62. As was found by the court in these two cases, we have reached the conclusion, although the deceased was guilty of negligence in lying down on the track in an intoxicated condition, the proximate cause of the accident was the failure of the operators of the train to properly regulate the speed of the train under the circumstances, and their failure to keep a proper lookout and stop the train before striking the deceased.

However, we think the amount of damages awarded by the lower court, under the circumstances, is excessive. The deceased was killed instantly, and, being in an intoxicated condition when struck and killed by the train, doubtless never knew when he was struck and was not conscious of pain. The support received by plaintiff from his deceased son was small, and besides plaintiff has several other children on whom he may reasonably rely for at least some support. The son was not living with his father when killed, but was staying with a brother-in-law, with whom he was working. Unquestionably, the plaintiff must have undergone considerable mental pain and suffering from the fact that his son was killed and mangled in this horrible manner. In our opinion, the items of mental suffering and loss of companionship are the principal items on which the award should be based in this case. There are no set rules by which the amount of an award in such cases can be gauged. Each case must be controlled by its own peculiar facts and circumstances. For instance, an award of $2,500 made in the case of Roberts v. Louisiana Ry. & Nav. Co., 132 La. 446, 61 So. 522, Ann.Cas.1914D, 1207, while proper in that case, is too small in this case. We have decided to reduce the amount of the award to $3,500. Chanson v. Morgan's L. & T. R. R. & S. S. Co., 18 La.App. 602, 136 So. 647; Richard v. Baldwin et al., La.App., 167 So. 872.

For the reasons assigned, it is ordered that the judgment appealed from be amended by reducing the amount of damages allowed from $7,000 to the sum of $3,500, and, as thus amended, the judgment is affirmed; plaintiff-appellee to pay the cost of the appeal, and defendant to pay all other cost.

LE BLANC, Judge (dissenting).

The only theory on which recovery against the defendant can be predicated is, as stated in the majority opinion herein handed down, that where a person, as was the decedent in this case, is killed after having gone upon a railroad track and become incapitated, in a locality which by its nature is so dangerous, the operators of railroad trains running through such locality are charged with the knowledge of the conditions which exist, and must control their trains under a reasonable expectation that a person may be found at any time lying on the track, unable to extricate himself from danger. I agree that a certain class of cases support such a theory under which liability is imposed, but I respectfully disagree with the majority of the court that the facts justify an application of the theory in this case.

I submit that a territory encompassed within "a radius of a mile or slightly more

in each direction" from a given point on a railroad track, a mile away from the railroad station in a town of from 3,500 to 4,000 population, with only fifteen to twenty families' residing within that area, is not such a locality where there is such common use of the tracks by pedestrians as to hold the operators of a train to the duty of reasonably expecting to find a person lying thereon at 2:30 o'clock in the morning.

I rather believe that the case comes within the second class of cases mentioned in the majority opinion, and is governed by the rule on which the group of cases therein cited were decided. These are the cases of Rogers v. Louisiana Ry. & Nav. Co., 143 La. 58, 78 So. 237; Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 177, 178, 78 So. 438; Trotter v. Texas & P. Ry. Co., La.App., 146 So. 365; Pinckley v. Texas & P. Ry. Co., La. App., 165 So. 504.

I respectfully dissent.