## BOURGEOIS v. NEW ORLEANS, T. & M. RY. CO.

### No. 2053.

Court of Appeal of Louisiana. First Circuit.

Jan. 30, 1940.

Milling, Godchaux, Saal & Milling, of New Orleans, for appellant.

Pavy & Pavy, of Opelousas, for appellee.

DORE, Judge.

For her cause of action petitioner alleges that her son Simon Bourgeois, Jr. was run down and killed by defendant's train, through the sole negligence of the operatives thereof, at about 2 a. m. on March 3, 1933, at the trestle traversed by said train just west of the village of Lawtell in the Parish of St. Landry. Her petition sets forth that the section wherein her son was killed is densely populated and that it was incumbent upon the operators of defendant's train to proceed through that area with caution; that if the said operators had been operating the train with proper care they could easily have seen the deceased; but that the train was traveling at about 60 miles per hour, never slackened its speed and never sounded its whistle or gong or gave any warning whatever as it bore down upon the deceased. She alleges further that she is a widow, 60 years of age, and that her deceased son was unmarried, 22 years old and in robust health, and was her principal support. She prays for the sum of $7,500 for loss of support, $5,000 for mental anguish, pain and suffering, and $2,500 for the physical pain and suffering endured by her son; or a total of $15,000 as damages.

The defendant avers in effect that if the plaintiff's son met his death at the time and place alleged, such death was in no wise due to negligence of defendant's operators, but was due wholly to the negligence of plaintiff's son who was a trespasser to whom defendant and its employees owed no duty other than not wantonly and willfully to cause him injury, and who unnecessarily placed himself in a position of danger where he was bound to know and anticipate the presence and operation of trains.

Shortly after the accident occurred, and prior to the filing of this suit, the defendant company was placed in reorganization under Section 77 of the Bankruptcy Act, 11 U. S. C. A. § 205, in the District Court of the United States for the Eastern Division, Eastern Judicial District of Missouri. As a result of the reorganization proceeding, prosecution of this suit was stayed until the early part of 1938, after which, as a result of modifications of earlier orders in the reorganization proceeding, prosecution of the suit to a conclusion was permitted, the effect of any judgment, however, to be only to convert plaintiff's claim into a liquidated claim, the judgment not to be executory against defendant's property and assets and only to be enforceable in and under the reorganization proceeding.

The case was tried early in June, 1938, and on May 22, 1939, a judgment was rendered in favor of the plaintiff in the sum of $5,000, which, however, was made executory only to the extent and pursuant to the orders of the court in the reorganization proceeding. The case is now before us on defendant's appeal from such judgment.

It is well established that plaintiff's son was killed by defendant's westbound train at the time and place alleged, while trespassing on defendant's railroad track. As set forth by this court in the case of Miller v. Baldwin, 178 So. 717, 721, three distinct and well-defined rules, relative to the duty of the operatives of a train in regard to trespassers on the track, have developed in our jurisprudence. Quoting from the Miller case:

"The first of these is that, where a grown person, apparently in the full possession of his faculties, is walking on the track in front of an approaching train, the engineer is not required to slow down or stop for such person, after giving proper signals, as he has a right to assume that such a person will heed the signal and get off the track before the train reaches him. * *. * Cases of this kind are illustrated by the case of Johnson v. Texas & P. Ry. Co., 16 La.App. 464, 133 So. 517, 135 So. 114, and the case of Russo v. Texas & P. Ry. Co., 177 So. 478 * * *.

"The second class of cases is where a person goes to sleep on the track, or gets intoxicated and lies down on the track, thus

changing his active negligence to a kind of passive negligence [or we might say where the negligence of the trespasser has become quiescent], and the locality where he thus places himself * * * is a rural section or sparsely settled community, and at a point where the operatives of the train could not be reasonably expected to find such a person on the track, the engineer is not required to keep the train under such control so as to stop within the range of the headlights, but may take it for granted that there is no human obstruction on the track. This class of cases is illustrated by a large number of cases in our reports, * * * the most pertinent being: Rogers v. Louisiana Ry. & Nav. Co., 143 La. 58, 78 So. 237; Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 177, 178, 78 So. 438; Trotter v. Texas & P. Ry. Co., La.App., 146 So. 365; Pinckley v. Texas & P. Ry. Co., La.App., 165 So. 504.

"And the third class of cases * * * is where a person lies down on the track and, from sleep or intoxication, becomes unconscious of danger, and the locality where such person thus places himself * * * is in a populous city, urban section, or in a community where people frequently use the tracks as a footpath, and where there are several habitations and highway crossings, much greater care is required on the part of the operators of the train, and a greater responsibility is on them to keep a lookout for persons who may reasonably be expected to use the tracks for walking thereon, and who may be expected at times to lie down thereon and become unaware of their dangerous situation. The same rule applies to those who might become entangled on the track, or be unable to get off the track by their own power of locomotion. In such a situation and in such a locality, the operator of the train must regulate his speed so as to be able to stop his train on the sudden appearance of a human being on the track in an incapacitated condition. This class of cases is illustrated by the cases of Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708, and Jones v. Chicago, R. I. & P. Ry. Co., 162 La. 690, 111 So. 62. * * *"

Since plaintiff's petition alleges that: "* * * if the whistle of defendant's train had been blown or its gong sounded, petitioner's son would have been warned of the approach of said train and would have had the opportunity of moving to the side of said tracks of Defendant Company;

* * *", her case is apparently predicated on the theory that the decedent was standing or walking on or near the track when the train bore down on him, and remained in his position of danger because of the failure of the train operators to give him the proper warning signal. That theory would put the case at bar among the first class of cases mentioned in the quotation from the Miller decision.

The lower court, however, decided the case on the theory of the third class of cases mentioned in the quotation, and found that the facts herein were similar to those in the case of Miller v. Baldwin, supra.

In the Miller case it was found that the deceased was lying on the track, for the engineer and fireman testified that they thought they had passed over a "brown paper" lying on the track, which it was afterward shown was the person of the deceased. In the instant case both the engineer and the fireman testify that they never saw the deceased. The evidence is to the effect that deceased was last seen alive at about 1 o'clock a. m., an hour before the accident, at the intersection of the paved road with the black top road (a distance of about a quarter of a mile or more from the scene of the accident), at which time he appeared to be drinking, but was wide awake, was walking all right, but talked somewhat more than usual. It does not seem probable, from that testimony, that at that time the deceased was under the influence of intoxicating drink to the extent that he was ready to lapse into helpless sleep, especially after a walk of a quarter of a mile or so on a March night. It is possible that he drank more liquor after having been last seen, although there is no showing that he carried a bottle or of any other fact which would indicate that he drank alone. It is possible, too, that the alcohol did not have its full effect until later, though it would seem that the walk would have had a sobering effect rather than the opposite. Nevertheless, the trial court found that apparently the deceased was lying down, or fallen down, when struck, for the reason that there was no evidence of the body having been struck on the front of the locomotive, but that such evidence was on the brake beam about twelve feet from the point of the pilot, under the engine; and for the additional reason, apparently, that neither the engineer nor fireman saw the deceased, indicating that he must have been in a prone position.

The trial judge sets forth that in the Miller case the accident occurred over a mile from the Eunice railroad station, whereas in the present case it occurred at a point less than 2,000 feet from the Lawtell station, or a little over one-third of a mile; that the accident herein happened 1,628 feet from the principal street running north and south through the center of Lawtell. He fails to state, however, that the accident in the Miller case occurred at a point slightly more than a quarter of a mile outside the corporate limits of Eunice, a town of approximately 4,000 population, and an important railroad stop, whereas in the present case the accident was at a point also slightly over a quarter of a mile from the western edge of Lawtell, an unincorporated village of two or three blocks and of less than forty families, which was a flag stop in the daytime, and not even a flag stop in the night.

The lower court calls attention to the fact that in the Miller case this court found that within a radius of a mile or slightly more from the point of the accident at least fifteen or twenty families lived, excluding those who lived within the corporate limits of Eunice. And that in the present case, within the radius of half a mile, at least the same number of families lived. He apparently fails to consider, however, that by adopting a radius of one-half mile in this case, one must include the whole village of Lawtell and all the houses to the west of Lawtell for about a quarter of a mile beyond the point of the accident; that by far the greater number of families thus included were to the south of the railroad track on or near the paved highway running parallel to the railroad; and that the only families who used the railroad to any extent at all as a pathway were the few families to the north of the track. Using the same radius in determining the number of families from the point of accident in the Miller case, which happened about a quarter of a mile from the corporate limits of the town of Eunice, and including the people in the corporate limits, we would arrive at a number of families several times greater than in the present case.

The lower court also draws a parallel with reference to the number of crossings in the vicinity of the accident in this case and the number of crossings near the point of the accident in the Miller case. There isn't a great deal of difference between the two cases in this respect, except that it is apparent that in the Miller case the crossings were used to a greater extent than in the instant case, due to the larger center of population.

■ As pointed out by the trial judge, there is testimony to the effect that the track in the case before us was used as a footpath, but we cannot conclude that this use of the track was so great or so common as to be known to the railroad employees as was the situation in the Miller case. In the Miller case there was a beaten path along the side of the track, which we stated could not have escaped the attention of the train operators; this is not true in the case before us. It is our conclusion, from the evidence, that there was not a sufficient usage by pedestrians of the track in the case at bar, especially at night, and especially since the track was enclosed within wire fences, to constitute notice to the train operators that they might expect to find a human being present thereon, particularly in a prone position, at 2 a. m.

As for the nature of the country, from the evidence, including the testimony of the witnesses and the various photographs and maps introduced, we cannot escape the conclusion that the section wherein the accident occurred was typical South Louisiana farming country.

The negligence charged against the defendant consists of (1) failure to keep a proper lookout, (2) failure to give warning signals such as blowing the whistle and ringing the bell, (3) failure to see plaintiff's son on the track, and (4) failure to slacken the speed of the train which was traveling at the rate of 60 miles per hour.

It is proved that the train was traveling at the rate of 60 miles per hour and did not slacken its speed. It is admitted by the engineer and fireman that they did not see the deceased, and that their first knowledge that he had been run over and killed was obtained by them later in the day at the end of their run, when they were informed by a train mechanic that he found evidence of the death on the brake beam of the locomotive. It is proved that the proper warning signals were given, including the blowing of the whistle and the ringing of the bell. It is shown the the engineer and fireman could see within the range of the headlight for a distance of about 800 feet ahead, and it is testified that traveling at the rate of 60 miles per hour the train could not be brought to a stop within less than 1,200 feet.

■ In the light of the above facts and considerations, it seems reasonable to conclude, if as pleaded by the plaintiff the deceased was standing or walking on the track, that he should have stepped out of the way when the warning signals of the approaching train were given, and that his failure to do so under these circumstances constituted active, continuing negligence, which bars recovery, even if it were found that the defendant's operators were also guilty of negligence in failing to keep a proper lookout, failing to see the deceased, and running the train at the rate of 60 miles per hour.

If the true situation is that the decedent was lying down in a helpless condition on the track, contrary to plaintiff's allegations but in accord with the findings of the trial court, the main question raised is whether or not the defendant's operators were guilty of negligence causing the accident, in failing to keep a proper lookout, failing to see the decedent, and in operating the train at the rate of 60 miles per hour.

It is clear, if it was proper for the train to be run at the rate of 60 miles per hour at the place of the accident, that the accident could not have been prevented even if the decedent would have been seen within the range of the headlight, that is 800 feet, as it would have been physically and mechanically impossible to have stopped the train, traveling at the rate of 60 miles per hour, within a distance of less than 1,200 feet. Since there is no law, or rule of the defendant company, against the train traveling at that rate of speed, and since the safety of the passengers was in no way imperiled by that speed, it is obvious that the 60 mile per hour rate was proper, unless it can be concluded that the country traversed was urban, densely populated country where the track was commonly used as a footpath to the knowledge of the defendant's employees.

The trial court arrived at the latter conclusion on a finding that the facts herein were similar to those in the case of Miller v. Baldwin, supra. In view of the above considerations, we cannot agree with the trial court, and we find that the section where the accident occurred was much more sparsely populated than the section of the accident in the Miller case, and that the evidence with reference to the use of the track as a footpath shows that it was not generally used, especially at night, to the knowledge of the train employees.

■ We feel that this court has gone far enough in the Miller case in finding that the section wherein the accident occurred came within the rule of the third class of cases cited in the quotation from that decision, and that to extend the theory of urban population and usage of track as a footpath to a section as in the present case would necessarily mean that a considerable part of the State, if not more than half, would have to be considered urban country wherein the railroads would have to limit their speed to within 30 or 40 miles per hour in order to be free from liability in accidents of this type. It is obvious that, with such a limitation, railroads would be unable to maintain sufficient speed to meet present schedules, and the service to the public would thereby be seriously impaired.

It is our conclusion that this case must fall within either the first or second class of cases cited in the quotation from the Miller decision, and not in the third class as found by the lower court, and that there is therefore no liability on the part of the defendant railroad for the unfortunate death of young Bourgeois.

For these reasons, the judgment below is reversed, annulled and set aside, and plaintiff's suit dismissed.

OTT, Judge (concurring).

While I am of the opinion that the trial judge was justified in finding that the deceased was run over while lying on the track either asleep or intoxicated to the point of insensibility, yet I concur in the opinion in this case wherein it is held that the nature of the locality where the accident occurred is not such as to bring the case within the third class of cases mentioned in the Miller v. Baldwin case. In my opinion, this case comes within the second class of cases mentioned in the Miller case, and I further agree with the statement in the opinion that the Miller case was a border line case on this point.

In fact, the only difference of opinion on the part of the members of this court in the Miller case was whether or not the type of country where the accident occurred was such as to bring that case within the third class of cases instead of the second class. The organ of the court in that case and the organ of the court in the present case thought the type of country was such as to bring the case within the third class, while the other member of the court thought the case should come within the second class.

In determining the type and nature of the country where an accident of this kind occurs and the degree of care required on the part of the operatives of the train in operating through such country is to be fixed, I think the density of population, the use of the track by pedestrians as a footpath and the number and kind of road crossings in the vicinity are important criteria to be considered as was done in the Miller case. Considering the facts in this case on the basis of these criteria, I agree with the conclusion reached on this point in the opinion now being handed down.