The plaintiff is the surviving widow of Joe Hall, who was run over and killed by a freight train of the Kansas City Southern Railway Company on April 20, 1941, around 7:15 P.M. while he was sitting or lying in a drunken stupor on the track something over three quarters of a mile north of the City limits of DeQuincy and between 700 and 800 feet south of a road crossing known as Wasey Crossing. The widow brought this suit against the railroad and the engineer of the train, J.B. Harris, for damages in the sum of $18,000. The trial judge rejected her demands, and she has appealed.
Plaintiff conceded (as indeed she must) the negligence of her deceased husband in sitting or lying on the railroad track in a drunken condition and becoming incapacitated in such a place of danger, but she relies for recovery on the doctrine of the last clear chance as announced and applied in numerous cases, particularly in the case of Miller v. Baldwin et al., La.App., 178 So. 717, 721. She contends that the nature of the country and the surrounding conditions were such as to have required the operators of the train to see the deceased on the track in time to stop the train before running over him.
As we said in the Miller case, the controlling criteria in determining the speed at which a train is to be operated and the degree of care to be exercised by the operatives with respect to incapacitated trespassers on the track consist in the nature of the country, the density of population in the vicinity, the use made of the track by pedestrians as a footpath, and the number of highway crossings in the vicinity. In the Miller case we undertook to divide the cases on this point into three separate and distinct classes. In the second and the third class of such cases, we laid down the following general rule:
"The second class of cases is where a person goes to sleep on the track, or gets intoxicated and lies down on the track, thus changing his active negligence to a kind of passive negligence, and the locality where he thus places himself in a place of danger on the track is a rural section or sparsely settled community, and at a point where the operatives of the train could not be reasonably expected to find such a person on the track, the engineer is not required to keep the train under such control so as to stop within the range of the headlights, but may take it for granted that there is no human obstruction on the track. * * *
"And the third class of cases * * * is where a person lies down on the track and, from sleep or intoxication, becomes unconscious of danger, and the locality where such person thus places himself in a place of danger, is in a populous city, urban section, or in a community where people frequently use the tracks as a footpath, and where there are several habitations and highway crossings, much greater care is required on the part of the operators of the train, and a greater responsibility is on them to keep a lookout for persons who may reasonably be expected to use the tracks for walking thereon, and who may be expected at times to lie down thereon and become unaware of their dangerous situation. The same rule applies to those who might become entangled on the track, or be unable to get off the track by their own power of locomotion. In such a *Page 487 
situation and in such a locality, the operator of the train must regulate his speed so as to be able to stop his train on the sudden appearance of a human being on the track in an incapacitated condition."
The plaintiff contends that this case comes within the third class of cases described in the Miller case, while the defendants contend that the facts of this case bring it within the rule set forth in the second class of cases. It might be appropriate to mention here that in the later case of Bourgeois v. New Orleans, T. M. Ry. Co., La.App., 193 So. 394, in which case the writer of this opinion concurred, we said that the Miller case was a border line case, and we would not extend the rule further so as to bring within the third class those cases where the density of population, use of the track by pedestrians, number of road crossings, etc., were not as great or greater than was found to be the situation in the Miller case.
The train that ran over and killed the deceased was going south toward DeQuincy. The train consisted of eleven loaded and thirteen empty box cars, a caboose and the locomotive. The train was going from thirty to thirty-five miles per hour as it approached Wasey Crossing. The usual signals were given for the crossing, and, according to the preponderance, of the evidence, the weather was misty and foggy after a rain that afternoon. The engineer and fireman saw the deceased on the track just prior to or about the time the train reached the crossing, some 800 feet from the deceased, but they did not recognize him as a human being until the train had gone two or three hundred feet further when the train was five or six hundred feet from the deceased. The emergency brakes were applied and the emergency signals given as soon as the trainmen realized that the object on the track was a human being.
The evidence shows that it required a distance of 1,200 to 1,400 feet to stop this particular train going at a speed of about 35 miles per hour. The train was brought to a stop within about that distance and after it had gone several hundred feet from where the deceased was struck. The rules of the Interstate Commerce Commission require that locomotives be equipped with a headlight which will enable the engineer in the cab at night, in a clear atmosphere, to see an object the size of a man standing upright on the track a distance of at least 800 feet ahead. The track at the point of the accident is straight for several miles in each direction. Considering that the vision was somewhat restricted by the atmospheric conditions, we cannot say that the trainmen were negligent in failing to see the deceased on the track at a greater distance than they did see him. Conceding that they should have seen and recognized him as a human being at a distance of 1,000 to 1,200 feet which appears to be the maximum distance a person can be seen on a clear night, the train could not have been stopped within that distance and the accident prevented. According to the rules of the railroad, the maximum speed of the train at this point was 35 miles per hour.
It is therefore clear that, if the nature of the country and the surrounding conditions bring this case within the second class of cases mentioned in the Miller case, the defendants are not liable as the operators of the train were going at a proper rate of speed, keeping a proper lookout and made reasonable efforts to stop the train after they saw the deceased on the track. However, if the situation was such as to place this case within the third class of cases mentioned in the Miller case, a greater degree of care was required of the operatives of the train, and they would have been under the duty of so regulating the speed of the train and keeping such a lookout as to be able to stop the train in the face of the sudden emergency.
A careful review of the voluminous evidence in the record convinces us, as it did the trial judge, that this case should be controlled by the principles laid down in the second class of cases mentioned in the Miller case and not the third class.
According to the map offered in evidence by the defendants, there is a gravel road running east and west which road crosses the railroad at Wasey Crossing. This road some 130 feet west of the railroad turns south toward DeQuincy and runs almost parallel with the railroad, gradually bearing away from the railroad so that when it reaches the town limits about a mile from the crossing, the road is nearly 500 feet from the track. The road goes cast from the crossing for a distance of almost a quarter of a mile, and then turns south, the road being from 1185 feet from the railroad where it turns south to 1260 *Page 488 
feet from the railroad at the City limits. This area between the railroad and the gravel road on the east down to the City limits is open woodland, rather low, and as some witnesses say, rather swampy. In this area east of the railroad, a tract almost a quarter of a mile wide and about a mile in length, there was at the time of the accident only one residence, that of the deceased who lived about 175 feet southeast of Wasey Crossing. For the most part this area has a rather thick growth of mostly small timber.
On the west side of the railroad from the crossing to City limits there were a few residences at the time of the accident. The nearest residence from the point of the accident was that of Sandifer, located some 400 feet south and between the railroad track and the gravel road on the west. Another residence was located across the gravel road some 275 feet from the railroad and about 100 feet below the Sandifer residence. In fact, from Wasey Crossing down to the corporate limits of the town of DeQuincy, a distance of a mile or so, there were not over a half dozen residences on both sides of the track. As the trial judge says, within a radius of one-half mile from the point of the accident there were not more than four residences anywhere in the neighborhood of the track. The growth of timber and brush on either side of the track for a distance of a half mile or so from Wasey Crossing gives the appearance of the country as that of open woodland, and very sparsely settled.
There was a mass of testimony offered pro and con on the use of the track by pedestrians as a footpath. Out of this mass of testimony, we gather that the track was used by pedestrians to some extent from DeQuincy as far north as Wasey Crossing. About 1,100 feet south of where the accident occurred, there is a swimming hole where some people go in swimming occasionally. This swimming hole is an old barrow pit on the east side of the track which fills with fresh water after a rain but gets muddy in dry weather. Most of the pedestrians who use the track for a footpath live a quarter or a half mile south of the point of the accident and use the track mostly in wet weather in going to and from town. A very few people use the track north of the swimming hole. This is quite different from the situation in the Miller case where we found that for a distance of one and a half miles west of Eunice there was a well defined and easily observed footpath beaten out on both sides of the rails and there was no reason why the trainmen who had gone over this track numerous times should not have known of this footpath and its use by pedestrians.
There are no road crossings south of Wasey Crossing for over a mile. The next crossing is in the town of DeQuincy. In the Miller case we found that there were three public road crossings and three lane crossings within this same distance. In fact, the engineer testified in that case that there were so many road crossings after he left the city limits of Eunice that he had to blow his whistle almost constantly for crossings to the point where the accident occurred.
The yard limit post is located about 1200 feet south of the point of the accident, and it is shown that the rules of the railroad require the train to be brought under control at the yard limit so that the train could be stopped within half the distance the trainmen can see ahead by the headlight. There is no reason to assume that the trainmen did not intend to obey this rule as they had as much as 1900 feet from Wasey Crossing in which to bring the train under control at the yard limit so as to be stopped within the distance prescribed by the rules. This distance was not only sufficient for them to check the speed of the train before reaching the yard limits and bring it under control, but was a sufficient distance for them to completely stop the train at the yard limits if that had been required.
For the reasons assigned, the judgment appealed from is hereby affirmed at the cost of plaintiff in both courts. *Page 489